United States Court of Appeals,

Eleventh Circuit.

No. 96-4430.

Leonard KRYS, Rebeca Krys, his wife, Plaintiffs-Appellees,

v.

LUFTHANSA GERMAN AIRLINES, Defendant-Appellant.

Aug. 25, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 92-2488-CV-DTKH), Daniel T.K. Hurley, Judge.

Before ANDERSON and EDMONDSON, Circuit Judges, and ROSENN[*], Senior Circuit Judge.

ANDERSON, Circuit Judge:

Following a three-day bench trial, a magistrate judge rendered a $2.4 million negligence judgment against defendant Lufthansa German Airlines ("Lufthansa") in favor of plaintiffs Leonard and Rebeca Krys. On appeal, Lufthansa raises challenges to both the factual findings and legal conclusions of the court below. Before turning to these challenges, we set out briefly the facts and procedural history of the case.

I. FACTS AND PROCEDURAL HISTORY[1]

On November 30, 1991, Leonard Krys ("Krys"), a 47-year-old travel agent, was a passenger on Lufthansa Flight 463, traveling from Miami to Frankfurt, Germany. Sometime in the early hours of the flight, Krys began to feel ill and contacted a flight attendant. The attendant requested that any doctors on board the plane identify themselves to the crew, and three passengers responded. After those passengers agreed that Dr. Samuel Fischmann was best suited to handle the situation, Dr. Fischmann began to tend to Mr. Krys. Precisely what symptoms either were evident to Dr. Fischmann or were conveyed to Dr. Fischmann by Krys is a matter of some dispute. Dr. Fischmann

---

[*]Honorable Max Rosenn, Senior U.S. Circuit Judge for the Third Circuit, sitting by designation.

[1]For our instant purposes, we need only sketch out the nature of the case; therefore, we resolve all disagreements regarding the facts in favor of the district court's findings. We resolve appellant's challenge to these fact findings in our discussion below.

concluded after his initial examination of the patient that "there was nothing to worry about";[2] only when the flight was over Amsterdam did Dr. Fischmann become convinced that Krys might be having a heart attack.  However, the magistrate judge found that Mr. Krys "suffered the symptoms of a cardiac infarction, as described by the American Medical Association and Lufthansa's Manual, ... within the first one and one-half to three hours of the ten hour flight...."  Although the plane's flight path kept it close to the east coast throughout the first one to three hours of the flight, the crew—ostensibly relying on Dr. Fischmann's opinion—did not make an unscheduled landing.  Upon landing in Germany, the plane was met by an ambulance which transported Krys to a hospital.  At the hospital, the doctors concluded that Krys had indeed suffered a heart attack.

Krys and his wife filed the instant action in the Southern District of Florida.  Invoking the court's diversity jurisdiction, the plaintiffs set forth causes of action for negligence and loss of consortium.  The plaintiffs' causes of action turned not on an allegation that any act or omission of Lufthansa *caused* Mr. Krys's heart attack, but instead on an allegation that Lufthansa's crew acted negligently in responding to the symptoms displayed by Mr. Krys and thus aggravated the damage to his heart.  The defendants, in turn, moved for summary judgment, arguing that the plaintiffs' state law causes of action were preempted either by the Warsaw Convention or, alternatively, by the Federal Aviation Act. The district judge denied the motion, and the case was tried to a magistrate judge with the consent of the parties.  After the district court rejected Lufthansa's preemption arguments, the case proceeded as a common-law negligence case.[3]  The magistrate judge concluded that Lufthansa was indeed negligent and rendered a judgment for Leonard Krys in the amount of $1.8 million and for Rebeca Krys in the amount of $600,000.[4]

---

[2]According to Dr. Fischmann's testimony, he originally believed Krys had had too much to drink.  When the pain did not subside with time, he began to suspect that Krys was experiencing angina pains.

[3]*See* n.19 *infra.*

[4]The magistrate judge later granted a motion allowing Lufthansa a $4,699.42 set off for an insurance payment received by Krys. However, we will refer to the original sum granted as an approximation of the award.

On appeal, Lufthansa presents the following challenges to the judgment below: (1) the plaintiffs' state law claims are preempted by the Warsaw Convention because the events that transpired constitute an "accident"; (2) the judge erred in finding that Krys displayed the symptoms of a heart attack in the first one and one-half to three hours of the flight; (3) the judge erred in finding that Lufthansa was negligent; (4) the judge erred in finding that Krys suffered damage to his heart wall as a result of Lufthansa's negligence; and (5) the damages awarded were excessive.[5] We address each argument in turn.

## II. APPLICABILITY OF THE WARSAW CONVENTION

First, we address appellant's argument regarding the applicability of the Warsaw Convention.[6] Under Article 17 of the Warsaw Convention, an international treaty binding on the United States, air carriers are liable for injuries sustained by a passenger on an international flight "if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking." 49 Stat. 3018 (providing the official English translation of the governing French text). As the Supreme Court recognized in *Air France v. Saks,* 470 U.S. 392, 396, 105 S.Ct. 1338, 1341, 84 L.Ed.2d 289 (1985), "[an airline] is liable to a passenger under the terms of the Warsaw Convention only if the passenger proves that an "accident' was the cause of her injury." In the instant case, appellant Lufthansa argues that the events that transpired on the flight in question constitute an "accident" under the terms of the

---

[5]Lufthansa makes no argument on appeal relating to preemption by the Federal Aviation Act.

[6]The Warsaw Convention is the popular name for the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* note following 49 U.S.C.App. § 1502. For an overview of the Convention as originally enacted and a survey of the subsequent history affecting the Convention, see *Floyd v. Eastern Airlines, Inc.,* 872 F.2d 1462, 1467-1469 (11th Cir.1989), *rev'd on other grounds,* 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991).

Convention, and therefore, that the Warsaw Convention—including its liability limits[7]—applies and

preempts the plaintiffs' state-law negligence claims.[8]

---

[7]Under the terms of the Warsaw Convention as originally enacted, a carrier's liability was limited to approximately $8,300 (except in cases involving "willful misconduct"). The Montreal Agreement of 1966, a private inter-carrier agreement, raised the liability limit for international flights originating, terminating, or having a connecting point in the United States to $75,000. *See Floyd,* 872 F.2d at 1467-1469. Just last year, the Department of Transportation approved a more complicated private agreement affecting the liability limits of the Warsaw Convention. *See Tseng v. El Al Israel Airlines, Ltd.,* --- F.3d ---- (2d Cir. June 13, 1997) (summarizing the agreement).

[8]The precise preemptive scope of the Warsaw Convention is a matter of some debate. Some courts have held that where there is an "accident" within the terms of the Warsaw Convention, the Convention applies and preempts state law causes of action entirely. *See Floyd v. Eastern Airlines, Inc.,* 872 F.2d 1462, 1482 n. 33 (11th Cir.1989) (citing cases to this effect), *rev'd on other grounds,* 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991). We have previously held only that where there is an "accident" within the terms of the Warsaw Convention, the Convention applies and preempts *inconsistent* provisions of state law. *Id.* at 1482 (declining "to speculate further on the issue of whether the Warsaw Convention entirely preempts state law causes of action once its provisions are triggered by an "accident' within the meaning of Article 17"). Because we do not find an "accident" within the terms of the Convention, we need not address the question whether there is preemption of the entire cause of action or only of inconsistent provisions of state law.

Finally, we note that there now exists a split in the circuits as to whether the Warsaw Convention preempts state law causes of action where an incident occurs on an international flight, but does not meet the definition of "accident." *Compare Abramson v. Japan Airlines Co., Ltd.,* 739 F.2d 130 (3d Cir.1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985), and *Tseng v. El Al Israel Airlines, Ltd.,* --- F.3d ---- (2d Cir. June 13, 1997) (both holding that the Warsaw Convention does not preclude alternative theories of recovery in cases where there is no covered "accident"), *with Potter v. Delta Air Lines, Inc.,* 98 F.3d 881 (5th Cir.1996) (finding preemption even in the absence of an "accident"). Both at oral argument and in a post-argument letter brief on an entirely different question, Lufthansa has attempted, somewhat circuitously, to invoke the argument accepted by the Fifth Circuit (hereinafter called the "total preemption argument"). We decline to entertain this argument for the following reasons. First, we think it is clear that Lufthansa abandoned this argument in the court below. Lufthansa's motion for summary judgment presented, in effect, a total preemption argument: Lufthansa argued that the Warsaw Convention applied because the incident occurred on an international flight; that state-law causes of action were thus preempted; and that Lufthansa was not liable under the Convention because there was no covered "accident." However, after plaintiffs submitted an opposition citing the overwhelming contrary case law, Lufthansa appeared to shift gears completely. In its reply to plaintiffs, Lufthansa asserted only that if there were indeed crew negligence, as the plaintiffs asserted, such negligence would constitute an "accident" and thus bring the case within the purview of the Convention. In other words, Lufthansa appeared to abandon the total preemption argument in favor of the more modest preemption argument that turns on the presence of an "accident." The court below rejected the airline's preemption argument, characterizing the argument as the more modest version. The airline interposed no

4

Our determination of whether an "accident" occurred is guided by the Supreme Court's decision in *Air France v. Saks,* 470 U.S. 392, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). In *Air France,* the Court resolved a split in the courts of appeals regarding the proper definition of the term "accident" as used in the Warsaw Convention. After examining the text of the Convention, its negotiating and subsequent history, and the weight of precedent in the Convention's signatory countries, the Court rejected the argument that "accident" means "an occurrence associated with the operation of an aircraft which takes place between the time any person boards the aircraft with the intention of the flight and all such persons have disembarked." *Id.* at 396, 105 S.Ct. at 1340. Instead, the Court held that an "accident" is properly defined as "an unexpected or unusual event or happening that is external to the passenger." *Id.* at 405, 105 S.Ct. at 1345. The Court then applied this definition to the case before it, which presented the question whether a loss of hearing caused by normal operation of the aircraft's pressurization system constitutes an "accident" within the meaning of Article 17. The Court answered this question in the negative, saying that "when the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident." *Id.* at 406, 105 S.Ct. at 1345.

Lufthansa urges us to hold that a negligent response to a passenger's heart-attack symptoms constitutes an "accident" under the terms of *Air France.* In its view, aggravation of a preexisting condition due to crew negligence is *ipso facto* an injury caused by an "unexpected or unusual event ... external to the passenger." This argument has some intuitive appeal: the response of the crew to the passenger's situation is external to the passenger, and deviation from the normal standard of care is at least arguably "unexpected" or "unusual." As further support for their argument that the

---

objection to the court's characterization of the preemption argument, and thereafter the case proceeded as a state law claim. On appeal, Lufthansa did not present the total preemption argument either in its initial brief or in its reply brief; instead, Lufthansa only raised the argument assuming the presence of an "accident." Dual concerns of efficient administration and fairness to the opposing party persuade us not to entertain the total preemption argument in the instant case.

conduct alleged in the instant case constitutes an "accident," Lufthansa cites the pre-*Air France* case of *Seguritan v. Northwest Airlines, Inc.,* 86 A.D.2d 658, 446 N.Y.S.2d 397 (N.Y.App.Div.1982), *aff'd,* 57 N.Y.2d 767, 454 N.Y.S.2d 991, 440 N.E.2d 1339 (1982) (mem.). In *Seguritan,* the court answered the question we are presented with today as follows:

> The incident in question is clearly an "accident" within the meaning of article 17. The "accident" is not the heart attack suffered by the decedent. Rather, it is the alleged aggravation of decedent's condition by the negligent failure of defendant's employees to render her medical assistance. This is somewhat analogous to the hijacking cases where the "accident" which caused the injury is not the act of the hijackers but the alleged failure of the carrier to provide adequate security....
>
> Thus, this case falls squarely within the terms and conditions of the Convention.

*Id.* 446 N.Y.S.2d at 398-99.

Plaintiffs, on the other hand, urge us to hold that there was no "accident" within the terms of the Warsaw Convention. In the plaintiffs' view, the instant case falls within the category of cases the Supreme Court described in *Air France* as not involving an "accident": cases in which "the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." *Air France,* 470 U.S. at 406, 105 S.Ct. at 1345. Relying on numerous cases holding that aggravation of pre-existing injuries due to inadequate care does not constitute an "accident" within the meaning of the Convention, the plaintiff argues that "the dispositive focus [of the accident inquiry] ... is upon the event or the chain of events which caused the *initial* injury"—in this case, the heart attack. Because there has never been an allegation that the heart attack itself was caused by an "unexpected or unusual event external to the passenger," the plaintiff argues that there can be no "accident" involved in this case.

We turn, then, to the case law in plaintiffs' favor. In *Scherer v. Pan American World Airways, Inc.,* 54 A.D.2d 636, 387 N.Y.S.2d 580 (N.Y.App.Div.1976), the plaintiff brought an action under the Warsaw Convention, alleging that sitting in an airline seat on one flight had caused him thrombophlebitis and sitting in an airline seat on another flight had aggravated that condition. Having noted that "[t]he planes were concededly not involved in a collision, nor was there any turbulence during the flights," the court held that there was no accident that would bring the suit

6

within the terms of Article 17.  In *Abramson v. Japan Airlines Co., Ltd.,* 739 F.2d 130 (3d Cir.1984),

*cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985), the plaintiff suffered an attack

from a pre-existing paraesophageal hiatal hernia while traveling from Anchorage to Tokyo.  When

plaintiff's wife asked the stewardess for a place where plaintiff could lie down and employ a

self-help remedy involving massaging his stomach and sometimes inducing vomiting, the stewardess

responded that there were no empty seats.  Discovery, however, revealed that there were nine empty

seats in first class.  Plaintiff sued the airline, claiming, *inter alia,* that the airline had been negligent.

In support of his argument that the aggravation of his injury by JAL's acts and omissions constituted

an "unusual and unexpected happening" and, thus, a Warsaw Convention "accident," plaintiff

analogized his case to cases involving terrorist attacks, hijackings, and bombings (which other courts

had found constituted "accidents").  Applying its "unusual or unexpected happening" test, the Third

Circuit rejected the plaintiff's arguments:

> We are not persuaded that the situations are analogous.  In none of those cases was the injury suffered during the course of a routine and normal flight, as here.  In the absence of proof of abnormal external factors, aggravation of a pre-existing injury during the course of a routine and normal flight should not be considered an "accident" within the meaning of Article 17.  *See Warshaw v. Trans World Airlines,* 442 F.Supp. at 413 (no "accident" where plaintiff's respiratory infection became aggravated during the flight, resulting in permanent hearing loss in one ear, because of a change in cabin pressure which is part of the normal flight procedure).

*Id.* at 133.  According to the panel, "the occurrence that allegedly aggravated plaintiff's condition

was not an "accident' within the terms of Article 17 of the Warsaw Convention."  *Id.* at 135.[9]

---

[9]*See also Adamsons v. American Airlines, Inc.,* 105 Misc.2d 787, 433 N.Y.S.2d 366 (N.Y.Sup.Ct.1980), *aff'd,* 87 A.D.2d 785, 449 N.Y.S.2d 487 (N.Y.App.Div.1982) (not addressing the Warsaw Convention argument), *rev'd,* 58 N.Y.2d 42, 457 N.Y.S.2d 771, 444 N.E.2d 21 (1982) (not addressing the Warsaw Convention argument), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3540, 77 L.Ed.2d 1390 (1983).  In *Adamsons,* the airline refused to allow a sick patient to board a plane returning to the United States;  allegedly, the delay in returning home resulted in plaintiff's paralysis.  Plaintiff sued the airline for negligence, and the airline argued that the case was within the exclusive purview of the Warsaw Convention.  The court rejected this argument, in part on the grounds that there was no "accident" within the terms of the Convention.  433 N.Y.S.2d at 369.  To the same effect, see *Northern Trust Co. v. American Airlines, Inc.,* 142 Ill.App.3d 21, 96 Ill.Dec. 371, 491 N.E.2d 417 (1985).

In two post-*Air France* cases involving allegations that the airline's failure to provide adequate medical care aggravated a passenger's heart attack, district courts have followed *Abramson* in finding no Article 17 "accident." *See Tandon v. United Air Lines,* 926 F.Supp. 366 (S.D.N.Y.1996); *Fischer v. Northwest Airlines, Inc.,* 623 F.Supp. 1064 (D.C.Ill.1985). *See also Walker v. Eastern Air Lines, Inc.,* 775 F.Supp. 111 (S.D.N.Y.1991) (parties agreed there was no Warsaw Convention "accident" where plaintiff alleged that inadequate care aggravated her husband's preexisting asthma condition and contributed to his death).

Initially, we note that we disagree with the plaintiffs' reading of the case law in their favor. We do not think the cases are accurately explained as focusing solely on the initial injury and—in essence—ignoring any subsequent events. *Abramson,* the leading case, is better explained as turning on a conclusion that the aggravation injury suffered by the plaintiff simply was not caused by "an unusual or unexpected event or happening external to the plaintiff." This conclusion is not unassailable: as we suggested above, it is at least arguable that where injury is caused by crew negligence, the injury arises from an "unexpected or unusual event or happening external to the plaintiff."

On the other hand, if we substitute a purely factual description of the relevant events in place of the legal conclusion represented by "crew negligence," the conclusion that no "accident" occurred is seen as the more reasonable conclusion. If, in *Abramson,* the aggravating event is having to sit upright in an airline seat throughout the duration of the flight, then it seems clear that the aggravation does not arise from an "unexpected or unusual event"—instead, the aggravation injury arises solely from the "passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." By the same token, if, in the instant case, the aggravating event is the continuation of the flight from its scheduled point of departure to its scheduled point of arrival,[10] then it seems

_____

[10]We identify this as the relevant event by asking what precise event or events allegedly caused the damage sustained by the plaintiff. In the instant case, it is clear that if the plaintiff suffered damage as a result of any external event, that event was the continuation of the flight and the resultant delay in hospitalization.

8

clear that the aggravation injury arises not from an "unexpected or unusual happening," but rather from the "passenger's own internal reaction to the usual, normal, and expected operation of the aircraft." *See Warshaw v. Trans World Airlines, Inc.,* 442 F.Supp. 400, 412 (E.D.Pa.1977) ("[I]t is clear under Article 17 that if the hypothetical passenger's heart condition were to have been aggravated by the acceleration required on take-off, or by the deceleration which occurs when landing, such an occurrence would not be an injury as the result of an "accident'....").

We acknowledge that this is a close question, and we have done our best to do justice to the arguments on either side of the issue. However, ultimately we are convinced that the proper approach is indeed to look at a purely factual description of the events that allegedly caused the aggravation injury suffered by the plaintiff. Such an approach is in accord with the plain meaning of the phrase "event or happening" as used in the *Air France* Court's definition of "accident" and with the manner in which the Court described the decisions of the lower courts. In particular, we note that in summarizing the *Abramson* decision in a parenthetical, the Court described the relevant event as "sitting in airline seat during normal flight" notwithstanding the fact that the plaintiff had attempted to make out the Warsaw Convention claim based on the airline's "acts or omissions"—i.e., its negligence. *Air France,* 470 U.S. at 405, 105 S.Ct. at 1345. Next, we find that lower courts determining whether an "accident" has occurred have typically looked to a purely factual description of the event.[11] Finally, we think that looking at the factual events, as opposed to an assertion of

_____

[11]*See, e.g., Floyd v. Eastern Airlines, Inc.,* 872 F.2d 1462, 1481 (11th Cir.1989) ("The engine failure in question was an "accident' within the meaning of the Convention ...."), *rev'd on* other grounds, 499 U.S. 530, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991); *Gezzi v. British Airways PLC,* 991 F.2d 603, 605 (9th Cir.1993) ("The presence of water on the stairs qualifies as an "accident' because it was both "unexpected or unusual' and "external to' [the plaintiff]."); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 33 (2d Cir.1975) ("It is undisputed, moreover, that a terrorist attack is considered an "accident' within the purview of these provisions."), *cert. denied,* 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976); *Chendrimada v. Air-India,* 802 F.Supp. 1089, 1093 (S.D.N.Y.1992) ("[I]t is the fact of being kept on board the plane without food, no matter what the reason, which is itself the "unexpected and unusual event' in the chain."); *Diaz Lugo v. American Airlines, Inc.,* 686 F.Supp. 373, 375 (D.P.R.1988) ("The coffee spill was an unusual or unexpected event external to [the plaintiff] and, thus, an Article 17 "accident.' "); *Oliver v. Scandinavian Airlines System,* 17 Avi. (CCH) 18,283, 18,284 (D.Md.1983) ("[T]he proper focus is on what happened to the passenger. Consequently, this court concludes that an accident occurred when the fellow passenger fell unexpectedly upon the plaintiff."). We note that

"crew negligence," is in accord with the design of the Warsaw Convention, which provides carriers a "due care" *defense.*[12] Having provided for a defense turning on the absence of negligence, we think it is unlikely that the drafters intended that the initial "accident" inquiry be resolved by reference to negligence. *Cf. Air France,* 470 U.S. at 407, 105 S.Ct. at 1346 ("The "accident' requirement of Article 17 is distinct from the defenses in Article 20(1), both because it is located in a separate article and because it involves an inquiry into the nature of the event which *caused* the injury rather than the care taken by the airline to avert the injury."). As we set out in the preceding paragraph, looking solely to a factual description of the aggravating event in this case—i.e., the continuation of the flight to its scheduled point of arrival—compels a conclusion that the aggravation injury was not caused by an "unusual or unexpected event or happening that is external to the plaintiff."

The Supreme Court's treatment of the Third Circuit's holding in *Abramson* provides further support for our ultimate conclusion that the instant case does not involve a Warsaw Convention "accident." Expounding upon the assertion that its interpretation of the Convention was consistent with the weight of precedent in foreign and American courts, 470 U.S. at 400, 105 S.Ct. at 1343, the Court in *Air France* first described foreign case law supporting the decision, then wrote:

> These observations are in accord with American decisions which, while interpreting the term "accident" broadly, *Maugnie v. Compagnie Nationale Air France,* 549 F.2d, at 1259, nevertheless refuse to extend the term to cover routine travel procedures that produce an injury due to the peculiar internal condition of a passenger. *See, e.g. Abramson v. Japan Airlines Co.,* 739 F.2d 130 (C.A.3 1984) (sitting in airline seat during normal flight which aggravated hernia not an "accident"), cert.denied, 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835; *MacDonald v. Air Canada,* 439 F.2d 1402 (1st Cir.1971) (fainting while waiting in the terminal for one's baggage not shown to be caused by an "accident"); *Scherer v. Pan American World Airways, Inc.,* 54 A.D.2d 636, 387 N.Y.S.2d 580 (1976) (sitting in airline seat during normal flight which aggravated thrombophlebitis not an "accident").

*Seguritan,* the sole case squarely supporting the defendant's position, is *contra.*

[12]Under Article 20(1) of the Warsaw Convention, carriers may defend claims on the grounds that they took all necessary measures to avoid the passenger's injury or that it was impossible to take such measures. *Air France,* 470 U.S. at 406-07, 105 S.Ct. at 1346. We note that the Montreal Agreement requires carriers to waive this "due care" defense for international flights which originate, terminate, or have stopping points in the United States. *Id.* However, this waiver is immaterial to the argument we present above.

10

*Id.* at 404-05, 105 S.Ct. at 1345. We do not see any material factual distinctions between *Abramson* and the instant case. We find support for our decision in the Supreme Court's suggestion that *Abramson* is an example of a case where "routine travel procedures ... produce an injury due to the peculiar internal condition of a passenger" and the Court's holding that this latter category of cases does not fit within the definition of "accident" for purposes of the Warsaw Convention.

For the foregoing reasons, we conclude that the events that transpired on the flight do not constitute an "accident" within the meaning of the Warsaw Convention.

### III. FINDINGS REGARDING KRYS'S SYMPTOMS

Lufthansa also argues that the court below erred in finding that the plaintiff displayed the symptoms of a heart attack (as described by the American Medical Association and by Lufthansa's Manual) within the first one and one-half to three hours of the flight. According to Lufthansa's Operating Procedures Manual, the symptoms of a heart attack are as follows: "The patient complains about feeling an ongoing pain and tightness in his chest, which may radiate into the neck area and the left arm. The patient shows a sudden paleness and is restless." The manual also provides the following "rough distinction" between angina and a heart attack: "After administering [nitroglycerin], pain from angina pectoris disappears after 2 to 3 minutes at the most. In a heart attack, pain usually persists." The symptoms described by the American Medical Association are "crushing pain in the center of the chest, pain in the chest, pain in the jaw, arms, tightness in the chest, bursting sensation in the chest, dizziness, shortness of breath, sweating, and nausea."[13]

The federal rules provide that a district court's findings of fact in actions tried without a jury may not be reversed unless clearly erroneous. Fed.R.Civ.P. 52(a). A finding is clearly erroneous when the reviewing court, after assessing the evidence in its entirety, is left with a definite and firm conviction that a mistake has been committed. *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). As the Supreme Court has cautioned:

---

[13]We take this list of symptoms from a question asked by plaintiffs' counsel that appears to catalog the AMA-indicated symptoms. We note that we do not find the parties in dispute as to what the basic symptoms of a heart attack are.

11

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

*Id.* at 573-74, 105 S.Ct. at 1511. The Supreme Court has further emphasized that where a trial judge's finding is "based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Id.* at 575, 105 S.Ct. at 1512.

Keeping the Supreme Court's admonitions firmly in mind, we find no clear error in the magistrate judge's finding that Krys displayed the symptoms of a heart attack within the first three hours of the flight. Mr. Krys testified that he went to the lavatory "about an hour and a half" into the flight because his stomach was upset and he felt nauseous and that he returned to the lavatory thirty minutes later because he was feeling nauseous and dizzy. There, he began to feel a "crashing, excruciating pain in [his] chest."[14] Krys also testified that he noticed his clothes were wet from perspiration. Josie Curry, a fellow passenger sitting in the row with Mr. Krys, testified that she observed him making these two trips and noticed that he was perspiring. Jan Holloway, another passenger, testified that she noticed the plaintiff returning from the lavatory:

> The first thing I really noticed was just glancing up and seeing someone coming back from like the restroom area, the galley area, just looking like he was airsick, you know, just that flushed kind of white pasty look you-hope-you-never-get-it type.... [K]ind of washed out is what I really meant, just where you just are gray and you just don't feel good.

Holloway also noticed that Krys was perspiring.

After returning from the lavatory, Mr. Krys contacted the flight attendant, who made an announcement asking any doctors on board to identify themselves to the crew. Dr. Fischmann responded to the call. In the estimation of both Josie Curry and Jan Holloway, the flight attendant

---

[14]We focus our review only on the symptoms *displayed* by Krys; however, we provide information regarding Krys's description of his subjective experiences to put the other testimony into context.

was contacted between an hour and an hour and a half into the flight; by Krys's calculation, this happened approximately two hours into the flight. Krys, Curry, and Fischmann all testified that Krys told the doctor at this time that he was suffering chest pains. Krys's testimony reflects that he told Dr. Fischmann that he had pain in his chest radiating into his arms, pain in his jaw, difficulty breathing, dizziness, nausea, and sweating. Josie Curry described the plaintiff's state this way:

> He appeared to have difficulty breathing. He started to get pale. He appeared to be very uncomfortable, you know, with the movement within his seat. Made me notice that he was very uncomfortable. It was like this man is miserable.

Jan Holloway echoed this description: "The man just was, I don't want to say in agony, but he was uncomfortable, couldn't sit still, couldn't stand, couldn't—just whatever position he tried to get into to get comfortable, it didn't last long."

In treating Krys, Dr. Fischmann administered two separate doses of nitroglycerin.[15] Curry testified that after the nitroglycerin was administered, "it didn't appear [Krys] was getting better...." Even after the second administration of nitroglycerin, according to Josie Curry, "He seemed miserable. He was pale-colored.... He looked ... about the same as he did before...." In Dr. Fischmann's assessment, there was "no big difference" in Krys following the administration of the nitroglycerin. As for the relevant time frame, Josie Curry estimated that the second dose of nitroglycerin was administered three hours into the flight. Jan Holloway similarly estimated that the events involving the summoning of the doctor, the administration of oxygen, and the dispensing of the nitroglycerin all occurred "between like an hour and a half ... to two and a half, three hours [after leaving Miami]."

We are aware that there is contradictory evidence in the record. The purser on board the airplane, Jurgen Freund, estimated that the crew was not contacted until at least two and a half hours into the flight. Freund also claimed that at the time he first saw the patient, he did not see any of the following symptoms: sudden paleness, pain in the upper thorax radiating to the shoulder, and

---

[15]Although Krys was also given oxygen, we focus on the effect of the nitroglycerin because, according to the Lufthansa Manual (discussed *supra* ), angina pains typically dissipate upon the administration of nitroglycerin, while symptoms of a heart attack persist.

13

sudden perspiring.[16] Dr. Fischmann testified that Krys had chest pains, "but they weren't severe." According to the doctor, Krys was "complaining a little bit but not as a typical heart attack." Fischmann further testified that he did not observe a changed complexion or "cold sweating" in the patient until the flight was over Amsterdam and that he never observed the passenger having difficulty breathing to the point that he couldn't speak very well. The captain on board, Hans Schnabl, testified that he saw the patient while he was being attended by Dr. Fischmann and did not observe that Krys was suffering severe chest pains or that he was sweating profusely.

The magistrate judge could have credited either the testimony of Purser Freund, Dr. Fischmann, and Captain Schnabl or the testimony of Leonard Krys, Josie Curry, and Jan Holloway. The choice made between these two permissible alternatives is, almost by definition, not clear error. *See Anderson,* 470 U.S. at 575, 105 S.Ct. at 1512. The challenged findings of the court below are not clearly erroneous.

## IV. FINDINGS REGARDING LUFTHANSA'S NEGLIGENCE

Next, Lufthansa challenges the magistrate judge's finding that Lufthansa acted negligently in its response to the symptoms displayed by Krys.[17] In particular, Lufthansa argues that its reliance

---

[16]At another point of his deposition, however, Freund stated that Krys "looked to me little bit pale."

[17]The magistrate judge made the following findings with regard to Lufthansa's negligence:

> 2. LUFTHANSA failed to take adequate measures to determine the life-threatening medical condition of LEONARD KRYS and failed to render, provide and/or secure necessary medical care.
>
> 3. LUFTHANSA failed to comply with its own policies and procedures to the detriment of LEONARD KRYS and failed to divert said aircraft and land at the nearest available airport.
>
> 4. LUFTHANSA, through its employees, servants and/or agents, failed to observe and apply its own first aid instructions regarding cardiac infarctions to the detriment of its passenger, LEONARD KRYS.
>
> 5. LUFTHANSA failed to contact its ground personnel in order to obtain medical assistance.
>
> 6. LUFTHANSA departed from accepted airline industry practices in failing to

14

on Dr. Fischmann's analysis and advice fulfilled its duty to Mr. Krys.[18] We review the magistrate judge's application of the standard of care to the facts of the case—i.e., the determination on the ultimate question of negligence—for clear error. *Daley v. United States,* 792 F.2d 1081, 1086 (11th Cir.1986).

Lufthansa relies primarily on two lines of cases in support of its argument that its deference to Dr. Fischmann's opinion was not a breach of the duty a carrier owes to its passengers. One line of cases is easily disposed of. Lufthansa cites numerous cases establishing that under maritime law, a shipowner will not be held liable through *respondeat superior* for the negligence of the ship doctor. These cases are inapposite for two reasons. First, these cases establish a general rule of maritime law, and maritime law does not govern the disposition of the instant case.[19] Second, the

take adequate measures to protect the health of its ticketed passenger, LEONARD KRYS.

Rather than reviewing each of these findings for error, we answer only Lufthansa's particular contentions as set out above.

[18]Lufthansa also argues that the question of the crew's negligence must not be determined "according to 20/20 hindsight"—i.e., according to the after-acquired knowledge that Mr. Krys indeed suffered a heart attack during the flight. Taken as a general admonition, we agree with this proposition. However, we find no support in the record for the implied assertion that the magistrate judge viewed the crew's actions through hindsight.

[19]The appellant argued both in its reply brief and at oral argument that maritime law should govern this case even if the Warsaw Convention does not apply. However, the appellant failed to argue this point as clearly as it should have in its initial brief on appeal. Rather, Lufthansa urged the application of maritime law in a somewhat different context, i.e., where the Convention applies but provides no rule of law on a particular issue. In other words, Lufthansa argued that maritime law should fill the interstices not covered by the Convention. Despite Lufthansa's lack of clarity, we may well have entertained the argument anyway had Lufthansa squarely and timely presented it to the district court. However, the record is clear that Lufthansa did not fairly raise the argument in a timely fashion in the district court, and therefore we decline to entertain the argument on appeal. Lufthansa has not brought to our attention any pretrial suggestion that maritime law should govern, and our own careful review of the record confirms that no such suggestion was made before trial. Quite the contrary, all the pretrial documents (e.g., the joint pretrial stipulation, Lufthansa's own mediation statement, the briefs on summary judgment, Lufthansa's own subsequent status report, and the order denying summary judgment) clearly contemplate that, absent preemption by the Warsaw Convention or the Federal Aviation Act, state law would apply. We think the record is clear that once the district court rejected appellant's preemption arguments, all parties and the court understood that the case would be tried under state law negligence principles. Two months *after* the trial, in its proposed findings of fact and conclusions of law, Lufthansa cited both Florida cases and maritime cases in support

plaintiffs do not allege that Lufthansa is vicariously liable for the negligence of Dr. Fischmann; instead, they argue that the airline is liable for negligently deferring to Dr. Fischmann's assessment of the situation.

Next, Lufthansa cites two cases for the proposition that deference to the advice of a competent physician satisfies a carrier's duty of due care. In *Gamble v. The New Bedford,* 111 F.Supp. 8 (D.R.I.1953), a passenger on an excursion from Providence, Rhode Island, to Block Island, Rhode Island, fell down a ship staircase and was knocked unconscious. The crew placed the passenger in a canvas chair in a semi-reclining position. When he regained consciousness, the passenger complained of a pain in his hip. A doctor in Block Island directed that the passenger be kept in the position in which he had been placed until he could be hospitalized; the passenger then returned to Providence. The plaintiff complained that the care and treatment he received—namely, having been put in a chair rather than a bed—constituted negligence. The court stated the relevant standard of care as follows: "The duty of a ship owner to a passenger who is injured during the voyage is to see that his injuries receive such care and treatment as is reasonably practicable in view

---

of its argument that Lufthansa did not breach its duty of care. After plaintiffs distinguished the maritime cases in part by pointing out that they arose in admiralty, Lufthansa filed a supplemental memorandum ostensibly regarding "a recent decision on point." In that memorandum, Lufthansa explicitly asserted for the first time that "maritime law applied to Mr. Krys' case." Even then, the assertion was made in a short paragraph consisting only of a conclusory assertion and a citation to two cases. In response, plaintiffs argued, *inter alia,* that the point was waived. The court's order expressly applies Florida law and contains no discussion of the applicability of maritime law. We construe this as a rejection on the basis of untimeliness, which is amply warranted. Only after the court's order issued did Lufthansa finally present a fully developed argument that maritime law should apply. A party who has marshaled and presented its evidence upon the understanding that one body of law governs may be prejudiced by the belated application of a different body of law. For the foregoing reasons, we decline to address the question of whether maritime law should have been applied. *See Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 598-99 (11th Cir.) (declining to resolve issues not fairly raised in the district court) (en banc), *cert. denied,* --- U.S. ----, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995).

of the facilities available." *Id.* at 12.[20]  Applying this standard to the facts, the court found no negligence:

> [T]he master was not a physician. The Court cannot say that the master, not knowing the full extent of libelant's injury, acted unreasonably in allowing libelant to remain in the adjustable chair. Furthermore, after Dr. Orlando's examination of the libelant, the master was acting under the doctor's direction in allowing libelant to remain in the position in which he had been placed. The Court is satisfied that at all times after the accident the libelant was maintained in a position which the master reasonably believed was proper under the circumstances.... *The care and treatment which the master adopted on his own initiative prior to the time of Dr. Orlando's examination, and at the doctor's direction after said examination, appears to have been reasonable under the circumstances.*

*Id.* at 12 (emphasis added). Although Lufthansa attaches much significance to the court's subsequent statement that "the [c]ourts have generally held that a master fulfills his duty to exercise due care if he follows the advice of a competent physician," *id.,* we do not think *The New Bedford* stands for the proposition that deference to a competent doctor fulfills the standard of care in all conceivable situations. As we read the decision, particularly the language emphasized in the quotation above, the court reviewed the reasonableness of the treatment afforded the plaintiff, giving weight to the fact that a doctor had recommended that treatment. We think this is substantially different from holding that because the crew did what the doctor recommended, it was *ipso facto* not negligent.

In *The Van der Duyn,* 261 F. 887 (2d Cir.1919), cited both by appellant and by the *New Bedford* court, a coal passer injured his arm while at sea. The officers on board treated the cut and bruise and prevented any infection. When the ship docked in Cuba, a doctor examined the injury and reported that no other treatment was necessary. Upon the ship's return to New York, however, it was discovered that the plaintiff had a fractured ulna and required surgery. In answer to the plaintiff's complaint that he was not given "considerate treatment" on board the ship, the court wrote:

> The officers of the ship owed to respondent the exercise of reasonable care to furnish such aid as ordinarily prudent persons would under similar circumstances.... [The doctor] did not report a fracture, or any unusual or serious condition of the arm, and therefore it cannot be said that in the exercise of reasonable care it was incumbent upon the officers of the vessel

---

[20]Although *The New Bedford* is a suit in admiralty, we find its analysis relevant to our decision because the standard of care applied in *The New Bedford* is similar to the standard governing the instant case.

to take the patient to a hospital in Cuba. On the return voyage to New York, the chief officer continued the treatment as directed by the doctor.

...

> ... We see nothing in the conduct of the officers of the ship which warrants condemnation, or upon which there may be fixed a liability for the shipowner. The requirement of a ship is to give reasonable medical treatment under all circumstances. There must be reasonable ground to believe that consequences more serious than the swelling, pain, and suffering which ordinarily attend a fracture or a severe laceration resulted, before liability be imposed. Medical advice received and followed, as was done by the officers of the ship, is all that could reasonably be expected from the officers here under the circumstances disclosed by this record.

...

> The ship will not be held responsible for an error of judgment on the part of the officers, if their judgment is conscientiously exercised with reference to conditions existing at the time.

*Id.* at 889-90. We think that *The Van der Duyn,* like *The New Bedford,* falls short of saying that reliance on a doctor fulfills the carrier's duty in all circumstances.

The parties do not cite, and our own research has not disclosed, more recent analogous cases. We therefore proceed to determine whether the magistrate judge's finding of negligence was clearly erroneous. Under Florida law,[21] a common carrier must "exercise the highest degree of care, foresight, prudence and diligence reasonably demanded at any given time by the conditions and circumstances then affecting the passenger and the carrier during the contract of carriage." *Swilley v. Economy Cab Co. of Jacksonville,* 46 So.2d 173, 177 (Fl.1950).

We agree that whether Lufthansa breached this duty is a close question. We are not unsympathetic to the defendant's argument that the crew's deference to Dr. Fischmann's analysis was reasonable under the circumstances—especially in light of the recognized difficulty of distinguishing a heart attack from other conditions that cause similar symptoms. Were we deciding the question of negligence *de novo,* perhaps we would resolve the issue differently. However, we

---

[21]We note that Lufthansa has not challenged the applicability of *Florida* law given the assumption that state law is to be applied.

do not sit in the place of the factfinder; we are only to ask whether the finding is clearly erroneous in view of the entire record. That much, we cannot say.

Plaintiff adduced expert testimony to the effect that the Lufthansa crew deviated from the airline industry standards which prevailed at the time of the incident.[22] Captain Paul Roitsch, an expert in aviation standards, testified:

> It's my opinion ... that the mere fact that a person appears and announces that he's a doctor does not relieve the crew of their responsibilities whatever. They must still continue to monitor and see what's happening and make sure that it's correct, which was not done in this case, and I think the results show what happens when the crew decides to walk away from a situation because there's a doctor on the scene.
>
> It's my feeling that Purser Freund should have immediately gone into his books and said to himself, I'm going to read and see what Lufthansa tells us to do about a heart attack, about a person with these symptoms, so that he could monitor what was happening.

Captain Roitsch summarized the failings of the crew as follows:

> [B]asically I see this as a failure to communicate. The airline established procedures for handling situations like this.[23] The captain must bear the ultimate responsibility as the person in charge ... who abrogated his responsibility and handed it over to another individual.
>
> ...
>
> [T]he captain should have made absolutely sure that he was getting good information at every point in the affair with Mr. Krys.
>
> This did not happen for some reason.... [I]f [the captain] had information that Mr. Krys was suffering the way he was suffering and has been described as suffering, that captain would have turned immediately and landed....

---

[22]Under Florida law, industry-wide standards are admissible as relevant, although not conclusive, evidence of the standard of care. *Brown v. Sims,* 538 So.2d 901, 905 (Fla.Dist.Ct.App.1989), *quashed in part on other grounds,* 574 So.2d 131 (Fla.1991).

[23]The Lufthansa Operating Procedures Manual describes the following "therapy" for a passenger displaying symptoms of a heart attack:

> Have the patient relax in supine position with slightly elevated upper body. Talk to the patient in a calming manner. Give fresh air and, if possible, supply with oxygen. Give 1 to 2 Nitrolingual [a brand name of nitroglycerin] capsules to chew in intervals (every hour). Check pulse in short intervals (every 15 minutes). After landing, have the patient immediately admitted to a hospital.

The Lufthansa Flight Operations Manual provides that a flight "may divert enroute" if a "passenger on board of flight requir[es] immediate medical assistance."

I guess what I'm trying to say is that the defense has said that if the doctor hadn't been there, Captain Schnabl would have landed, which tells us basically it's too bad the doctor was there, because his presence affected this event adversely in several ways, the most important one of which was it diverted apparently every person in that crew from pursuing his or her responsibilities, and I take that down to the last person in the cabin.

Roitsch further testified:

I am impressed by the fact that two lay witnesses were able to describe Mr. Krys's symptoms in a manner that absolutely fulfills the description of a heart attack by the AMA, by Lufthansa German Airlines, and by Dr. Fischmann himself.

I cannot believe, it's so difficult to believe that these were not evident also to that cabin crew, and being evident to the cabin crew, they should have passed on to the captain and to the doctor and the question asked should we not rethink our decision to land and land immediately.

There was one other thing that I wanted to say in here, and I think this is very crucial: That airplane was a full airplane. Everybody was very, very busy.... I think the volunteering of this doctor provided a means by which all of these crew members could say, fine, everything is wonderful, we can proceed as we normally would, and that to me is an abrogation of the responsibility that's placed in their hands.

Asked whether, based on industry standards, he believed the flight should have landed, the witness testified: "Yes, I believe they should have landed on the East Coast of the United States, or even farther up into Nova Scotia or Newfoundland would have been acceptable."[24]

We have upheld the magistrate judge's finding that Krys displayed all of the symptoms of a heart attack as outlined by the AMA and by Lufthansa's operating manual. *See* section III above. In light of that fact and the entirety of the evidence, we think the magistrate judge could conclude that notwithstanding Dr. Fischmann's impressions, Lufthansa's employees knew or should have known that Mr. Krys was suffering a heart attack, and thus that an unscheduled landing was necessary. Therefore, we cannot say that the magistrate judge's finding of negligence was clearly erroneous.

---

[24]In addition to Captain Roitsch's testimony, we note that Captain Schnabl himself testified:

If [Krys displayed all the symptoms alleged by the plaintiff], I would talk to the doctor much longer than I did and really ask him what's happening here. For heaven's sake, how are we going to continue? I would have to take care of it, and I would not have believed the situation was under control.... But if I get the word of a doctor that the situation is under control, there is no reason to divert and land....

## V. FINDINGS REGARDING DAMAGE TO KRYS'S HEART

Lufthansa argues that "even if an emergency landing had been made along the North American coast Krys would still have sustained damage to his heart wall." Taking this point of error as a challenge to the fact finding that Mr. Krys sustained significant permanent injury to his heart as a direct result of the failure to land the aircraft at an available airport,[25] we review for clear error.

We take Lufthansa's argument to be that enough time would have elapsed during the execution of an unscheduled landing and transportation to a nearby hospital that whatever treatment Krys could have received could not have mitigated the damage done to his heart. We note that there was conflicting evidence in the record as to how much time would have been required to land the plane and get Krys to a hospital; similarly, precisely when the heart attack occurred was a matter of some debate. However, even assuming *arguendo* that appellant is correct in asserting that treatment could not have been administered for three hours after the heart attack,[26] we find no clear error.

Dr. Peter Segall, a Miami cardiologist and one of Leonard Krys's treating physicians, testified that "if you are able to give thrombolytic therapy[27] within the first six hours after a myocardial infarction, you limit significantly the size of the amount of damage done, and the longer you wait, the less chance you have of helping." Dr. Segall testified more specifically that "had

---

[25]Given the questions asked by defense counsel of the witnesses and the precise phrasing of their point of error, we suspect that Lufthansa's argument is actually that Krys would have suffered *some* heart damage regardless of whether the plane made an unscheduled landing. We need not dwell on the factual accuracy of this point, for it is legally insignificant insofar as the question is whether Lufthansa is liable for negligence. Lufthansa may be liable for negligence so long as the delay *aggravated* the damage to the heart. Out of an abundance of caution, we take the appellant to have raised the relevant question and address it above. To the extent that Lufthansa's argument about the inevitability of some damage to the heart relates to the amount of damages awarded to the plaintiff, we factor this argument into our resolution of the appellant's excessive damages argument. *See* section VI *infra*.

[26]While we assume this time frame to be correct for the sake of argument, we note that we are inclined to think the appropriate time frame is actually less than three hours.

[27]According to Dr. Segall, thrombolytic therapy involves the administration of streptokinase. Thrombolytic therapy is "designed to break down the blood clot, which is the ultimate insult, ultimate occlusion which causes the heart damage."

21

[Krys] received thrombolytic therapy two to four hours after the onset of symptoms, he would have experienced significantly less damage than he did suffer."[28]  Dr. Leonard Zwerling, also a Miami cardiologist and treating physician to Mr. Krys, testified, "If he had been given thrombolytic therapy within the first few hours of his heart attack—the earlier the better, by the way—the chances are he would have a diminution, or lessened the size of the heart muscle damage."  Responding to defense counsel's suggestion that the damage Mr. Krys's heart sustained was a result of the heart attack rather than the delay in treatment, Dr. Zwerling stated, "It is a result potentially, [of] every delay, because the size of the damage might have been lessened if he received thrombolytic therapy earlier."  Dr. Leonard Sommer, a Miami cardiologist who examined Mr. Krys, testified that "within four to six hours after the onset of an infarction thrombolysis can diminish but probably not reverse completely a heart attack."

The magistrate judge's fact finding was supported by ample evidence.

## VI. EXCESSIVENESS OF DAMAGES

Finally, Lufthansa argues that the damages should be set aside as excessive.[29]  The magistrate judge awarded compensatory damages in the amount of $1.8 million to Leonard Krys and $600,000 to Rebeca Krys.  Because state law provides the rule of decision in this case—at least as it has been litigated,[30] our determination of whether this award was excessive is governed by state

---

[28]According to Dr. Segall, "longevity after a myocardial infarction is best related to the amount of damage that was caused by the heart attack."

[29]We note that the magistrate judge denied Lufthansa's post-trial motion for remittitur under Fed.R.Civ.P. 59.  The judge wrote:

> Lufthansa's Motion for Remittur fails to comply with Local Rule 7.1A by not including therein a memorandum of law in support.  Furthermore, remittur is not proper in cases involving bench trials.

Lufthansa has not argued that the magistrate judge erred in denying the motion for remittitur;  it has only urged us to set aside the verdict.

[30]We qualify our statement regarding the applicability of state law in light of our decision not to address the preemptive scope of the Warsaw Convention in the absence of an "accident" or the applicability of maritime law.

law. *Finch v. City of Vernon,* 877 F.2d 1497, 1506 (11th Cir.1989). In *Lassitter v. International Union of Operating Engineers,* 349 So.2d 622, 626-27 (Fla.1976), the Florida Supreme Court examined "certain well-established rules which control a review of the question of excessiveness of a jury's verdict":

> In *Seaboard Coast Line Railroad Company v. McKelvey,* 270 So.2d 705, 706 (Fla.1973), we said:
>
> > "Consistently, our Courts have vested juries with the sound discretion to render verdicts in personal injury cases, upon the equally consistent admonition that there is ample evidence to support such verdicts and that the verdicts are not clearly arbitrary or so excessive as to indicate passion, prejudice, corruption, improper motive or to shock the judicial conscience."
>
> Also in *Odoms v. Travelers Insurance Company,* 339 So.2d 196 (Fla.1976), we said:
>
> > "Under the general rule a verdict should not be disturbed on the ground of excessiveness unless it is manifestly so excessive as to shock the judicial conscience, or unless it is so excessive as to be indicative of prejudice, passion or corruption on the part of the jury, or unless it clearly appears that the jury ignored the evidence or misconceived the merits of the case relating to the amount of damages recoverable as, for example, by taking into consideration improper elements of damages." At p. 198.
>
> Although the verdict may be for considerably more or less than in the judgment of the court it ought to have been, still the court should decline to interfere, unless the amount is so great or small as to indicate that the jury must have found it while under the influence of passion, prejudice, or gross mistake. In order to shock the sense of justice of the judicial mind the verdict must be so excessive or so inadequate so as at least to imply an inference that the verdict evinces or carries an implication of passion or prejudice, corruption, partiality, improper influences, or the like. See *Damage Verdicts* by Parmele, Vol. 1, § 1 (1972).

We agree with Lufthansa that the verdict seems large. However, Florida law sets a high standard for setting verdicts aside as excessive, and in light of this standard, we cannot conclude that the verdict was excessive.

## VII. CONCLUSION

Having rejected each of the appellant's points of error,[31] we affirm the judgment.

---

[31]Appellant raises as a separate point of error that the magistrate judge's award of attorney's fees under Florida law was preempted either by the Warsaw Convention or by general maritime law. This argument is foreclosed by our resolution of Lufthansa's primary arguments regarding the applicability of the Warsaw Convention and maritime law.

AFFIRMED.[32]

---

[32]The appellees' motion for appellate attorney's fees is granted. *See* Fl. Stat. §§ 768.79 and 59.46. We remand this case for a determination of the appropriate sum.