Cielo ALLEYN and James Alleyn, Plaintiffs,

v.

UNITED STATES DISTRICT COURT OF NEW YORK AND NEW JERSEY, Delta Airlines, M.Mantec, Inc., Millar Elevator Service Co., and Schindler Elevator Corp., Inc., Defendants.

Civil Action No. 96–CV–1451(DGT).

United States District Court, E.D. New York.

July 13, 1999.

Charles J. Rappaport, Gandin, Schotsky & Rappaport, P.C., Melville, NY, for plaintiffs.

James A. Gallagher, Jr., Gallagher, Gosseen & Faller, Garden City, NY, for defendants.

Robert Seminara, Chalos & Brown, P.C., New York City, for MMantec.

Steven J. London, London & Doherty, LLP, New York City, for Millar.

## OPINION

TRAGER, District Judge.

Plaintiffs, Drs. Cielo and James Alleyn, are suing The Port Authority of New York and New Jersey, Delta Air Lines, Inc., MMantec, Schindler Elevator Corp. and its unincorporated subsidiary Millar Elevator Service for personal injury, loss of consortium and other causes of action arising from injuries Dr. Cielo Alleyn sustained as a result of an escalator accident on October 6, 1995. Currently, all defendants (except the Port Authority) have moved for summary judgment on the issue of limiting liability under the treaty popularly known as the Warsaw Convention.[1]

Specifically, Delta has moved for complete summary judgment and a total liability limitation of $75,000, alleging that Dr. Alleyn's accident took place while disembarking an international flight and thus falls under Article 17 of the Warsaw Convention. MMantec, as contractor and agent of Delta, has moved for partial summary judgment on the same ground or, in the alternative, has moved in opposition to Delta's motion. Schindler and Miller ("S & M"), as subcontractors of Delta and agents of MMantec, have moved to limit their collective liability to $75,000 as well. Plaintiffs have opposed these motions, alleging that Dr. Alleyn had finished disembarking when her accident occurred, that the provisions of the Warsaw Convention do not apply to MMantec and S & M, and that the liability limitation should not apply to any defendant because the injurious conduct was willful.

The Court concludes that the Warsaw Convention is applicable to Delta, since the accident in question occurred while Dr. Alleyn was disembarking an international flight and there is no evidence of Delta's

1. Convention for the Unification of Certain Rules Relating to International Transportation by Air, opened for signature Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876, 137 L.N.T.S. 11 (adherence of the United States announced Oct. 29, 1934).

willful misconduct. However, the Warsaw Convention does not apply to MMantec or S & M, since the terminal maintenance services they performed for Delta were not mandated by law nor done in the furtherance of the contract of carriage. Therefore, these defendants cannot obtain the protection otherwise afforded to agents of Delta under the Convention.

## Background

### (1)

On October 6, 1995 plaintiffs arrived at New York's JFK airport on Delta Flight 149. The Alleyns had departed from Miami, Florida on September 14 and flew to Madrid, Spain for a vacation which included travel in Madrid and Barcelona and a cruise to Venice, Italy. Although plaintiffs were to depart from Milan, Italy on October 6 to return to Miami through JFK, their reservations were changed; they flew to JFK on Flight 149 from Rome instead.

Plaintiffs arrived at Gate 5 in Delta's JFK Flight Terminal around 3:55pm on October 6. A Delta flight attendant stationed at the plane's door instructed the Alleyns to follow the line of deplaning passengers to the immigration and customs area. A Delta security agent was leading this line of passengers to the immigration area,[2] which is approximately 250 feet from the gate. (While plaintiffs' depositions reflect that neither of them remember the agent with certainty, Dr. Alleyn expressed her belief that the group of passengers was accompanied by an airline or terminal employee. *See* Exhibits to Notice of Motion for Summary Judgment in Favor of Delta Air Lines, Inc. Limiting Liability, Ex. B at 10(25) to 11(2)-(4)(transcript of the deposition of Cielo Alleyn).)

Flight 149's passengers proceeded south down an enclosed corridor for 52 feet. *See id.* at Ex. F. They then turned right into a second corridor where they proceeded in a westerly direction for 58 feet. *See id.* at Ex. G. The second corridor turned 90 degrees and emptied into a small down escalator (# 9), *see id.* at Exs. H, I, that led into a westerly corridor bisecting a main north-south corridor. *See id.* at Exs. J, M.

Both plaintiffs and defendants agree that another group of arriving passengers were in this main north-south corridor at the same time Flight 149 passengers were. However, these passengers, from a Swiss Air flight that arrived a few minutes before Delta's fight at a gate south of gate 5, were held in the corridor by a security agent until all flight 149 passengers had passed. *See* Pagnotta Aff. at 8.[3] From this corridor, the Delta passengers went west about 32 feet to a second down escalator (# 3) that led to immigration and customs. *See* Exhibits to Notice of Motion for Summary Judgment in Favor of Delta Air Lines, Inc. Limiting Liability, Ex. L. It was a step on this # 3 escalator that collapsed, trapping Dr. Alleyn's right leg in its mechanisms, causing serious injuries.

Plaintiffs do not dispute the following additional facts asserted by the defendants and germane to this motion:

1. The area traveled by Flight 149 passengers is a non-public ("sterile") portion of the terminal and leads only and directly from the plane to immigration;

2. Delta leased, operated and controlled this "sterile" area and was exclusively responsible for its management and

---

**2.** Delta bases this fact on the submitted Affidavit of John Pagnotta, Manager–Security and Facilities for Delta Air Lines at JFK. Mr. Pagnotta explained that it is Delta's standard operating procedure to have an employee of Argenbright Security (Delta's security service provider) meet Delta's arriving international flights, pick up the flight's "black box" and take it (and the passengers) to immigration. *See* Pagnotta Aff. at 7.

**3.** The security guard escorting the Swiss Air passengers was one of the first people to come to Dr. Alleyn's assistance after the accident occurred. *See* Pagnotta Aff. at 8; Exhibits to Notice of Motion for Summary Judgment in Favor of Delta Air Lines, Inc. Limiting Liability, Ex. K at 8(14)-(22) (transcript of the deposition of James Alleyn).

maintenance at the time of the accident; and

3. No other passengers or unauthorized personnel had the ability to or did mingle with the arriving Flight 149 passengers.

(2)

Prior to the date of the accident, Delta had contracted with MMantec to maintain the elevators, escalators, moving sidewalks and automatic doors found in Delta's JFK terminals.[4] MMantec, as agent of Delta, then subcontracted the maintenance responsibilities to Millar, the unincorporated subsidiary of Schindler. Millar and MMantec agreed to a reciprocal indemnification clause which provided that each would hold the other harmless for damages resulting from bodily injury or property damage caused by the negligent acts or omissions of the other. *See* Notice of Motion for Partial Summary Judgment in Favor of Schindler Limiting Liability, Ex. C at 7. In late 1992, MMantec and Delta supplemented their original agreement with an additional contract which covered specific repairs, including repairs to escalator # 3, which had been recommended in a deficiency report prepared by Millar in December of 1991. *See* Memorandum of Law in Support of Defendant, MMantec, Inc. Motion for Partial Summary Judgment, Ex. E. This second contract contained a provision in which MMantec agreed to indemnify Delta for all claims arising out of injuries in any way connected to work done in connection with the agreement.[5] *See id.* at 3.

Escalator # 3 had been taken out-of-service for repairs by Millar October 2–4, 1995. *See* Aff. of Patrick A. Carrajat, Ex. 4. Millar replaced eighteen broken steps on escalator # 3 with steps cannibalized from escalator # 1, which was no longer in use. *See id.* Dr. Alleyn's accident occurred on October 6, 1995 at around 4pm, and she remained trapped until 5:30pm or 5:45pm. According to her deposition testimony, she suffered a crush injury to her knee which caused a loss of muscle mass, a loss of sensitivity and feeling, and uncontrollable twitching and burning sensations in the area of her right knee. Additionally, a large flap of skin covering her right knee was torn away during her extraction from the escalator. This injury required a skin graft surgery using skin taken from her right thigh. Dr. Alleyn has had two additional surgeries to remove fat deposits and dead tissue from the injured knee and has also developed additional medical problems.

### Discussion

There is no dispute regarding the relevance of the Warsaw Convention to this case.[6] There is also no dispute that the bodily injuries sustained by Dr. Alleyn occurred from an "accident" within the meaning of the Convention.[7] The first

---

4. The original contract was not submitted by MMantec and the papers relating to this motion do not reveal the parties' original contracting date.

5. MMantec also asserts that it should have no liability whatsoever for Dr. Alleyn's injury because Delta prematurely terminated their contract on September 1, 1995, one and a half months prior to the accident. *See* Aff. of Stephanie Jilek, VicePresident of Administration and Finance for MMantec at 2. Even if Delta breached its agreement with MMantec, which somehow nullified its indemnity agreement with Delta, the breach still would not relieve MMantec of its responsibility to third parties for its negligent conduct. MMantec cites no authority to support its rather bizarre argument.

6. The Alleyns' itinerary provided for "international transportation" as defined in Article 1(2)of the Convention, as their tickets reflected an initial departure and ultimate destination in the United States ("a single High Contracting Party"), with scheduled stops in Spain and Italy ("an agreed stopping place within a territory ... of another power").

7. The term "accident" is defined in *Air France v. Saks*, 470 U.S. 392, 405, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), as "an unexpected or unusual event or happening that is external to the passenger." The Court directed this definition to be "flexibly applied after assessment of all the circumstances surrounding a passenger's injuries." *Id.*

disputed issue is whether or not Dr. Alleyn's accident is comprehended by Article 17 of the Convention, which requires that a passenger's damage be sustained "in the course of any of the operations of embarking or disembarking." 40 Stat. 3000 *et seq.* (1934), *reprinted in* 49 U.S.C. § 40105 note [hereinafter Warsaw Convention]. If the Warsaw Convention does apply and limits Delta's liability, the second issue is whether the protections of the Convention should be extended to MMantec and S & M as agents/independent contractors of Delta. Finally, plaintiffs' contentions regarding the defendants' "willful misconduct" must be addressed.[8]

### (1)

### *"Disembarking" under Article 17 of the Warsaw Convention*

Article 17 of the Warsaw Convention delineates when an international carrier is liable for damage or injury sustained by a passenger engaged in international air travel. The drafters of Article 17 specifically rejected proposed language that would have held carriers responsible for all injuries suffered by passengers "from the time when (they) enter the airport of departure until the time when they exit from the airport of arrival." *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 35 (2d Cir.1975) (citing the official French version of the minutes of the Warsaw conference found in II *Conference Internationale de Droit Prive Aerien* 171 (1930) [hereinafter *Warsaw Minutes* ], as translated by Prof. M. Riffaterre of Columbia University). The delegates also rejected a proposal which would have strictly limited carrier liability to only accidents occurring while passengers are actually onboard a plane. *See id.* (citing *Warsaw Minutes* at 49). Instead, the drafters chose a middle, but more ambiguous, position. The phrase finally enacted extends coverage to accidents which take place on the aircraft "or in the course of any of the operations of embarking or disembarking." Warsaw Convention at Art. 17.[9]

At first, courts determined the factual boundaries of this phrase by focusing almost exclusively on the physical location of the passenger when injured, in proximity

---

**8.** Plaintiffs also allege that summary judgment should be denied because there are material issues of fact in dispute and because discovery is not complete. Both these claims are faulty since, as will be discussed in detail *infra*, the facts central to the issues raised in these motions are undisputed by the parties. While plaintiffs' counsel attempts to create a material issue of fact by characterizing his clients' deposition testimony, an examination of the Rule 56(1) motions and supporting evidence reflect agreement among the parties as to the germane facts.

Denial of these motions for summary judgment 'due to lack of discovery is similarly baseless. The docket sheet for this case reflects that a status conference was held with Magistrate Judge Levy on Jan. 6, 1999. The current motions were discussed at that conference, and the parties decided that no more discovery was necessary until after the pending motions were decided. Plaintiffs' counsel was present at this conference, did not request additional discovery and assented to M.J. Levy's decision. *See* Defendant Delta Air Lines, Inc.'s Reply Mem. of Law in Support of Motion for Summary Judgment at 14–15.

**9.** In its recent decision in *El Al Israel Airlines v. Tsui Yuan Tseng,* the Supreme Court presented a hypothetical fact pattern almost identical to the facts here and found that the accident was obviously *not* contemplated by the Convention. —— U.S. ——, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). The Court confirmed that if a passenger is injured by a malfunctioning terminal escalator, the airline would not be covered by the Convention but would instead be subject to liability under local law. *Id.* at 673. This is true, however, only if the accident occurred outside the scope of the Convention, i.e., before or after any of the operations of embarking or disembarking. *Id.* Usually, as the Court's hypothetical reflects, disembarking would be completed by the time the passengers had left the gate area and long before they reached the terminal escalators. This was, however, an international flight and, as will be discussed in detail *infra*, Delta was required to and did retain control and responsibility for escorting Dr. Alleyn to the customs and immigration area, which is where she was going when she sustained her injuries. The precise timing and the context in which this accident occurred is the only reason Delta is brought into the scope of the Convention.

to the aircraft. *See, e.g., MacDonald v. Air Canada,* 439 F.2d 1402 (1st Cir.1971); *Felisima v. Trans World Airlines, Inc.,* 13 Av. Cas. (CCH) 17,145 (S.D.N.Y.1974). The Second Circuit, however, in its decision in *Day v. Trans World Airlines, Inc.,* shifted the focus away from location alone and created a flexible, tripartite evaluation to determine when Article 17 applies. 528 F.2d 31 (2d Cir.1975). The Second Circuit adopted a test developed by Judge Brieant in the Southern District which examines where the plaintiff was when the accident occurred ("location"), what the plaintiff was doing ("activity"), and at whose direction the plaintiff was acting ("control"). *See id.* at 33. The Second Circuit noted that the French word translated "operation" in Article 17 connotes not a single act but "a group of procedures combined to achieve a result." *Id.* at n. 7. This led the court to conclude that Article 17's coverage did not exclude "events transpiring within the terminal." *Id.* at 33. The court then applied its three factors to the situation in *Day* and found that Article 17 of the Convention applied to cover a terrorist attack that injured and killed international passengers who were lined up to go through a final security check before boarding their plane. *See id.*

■ After *Day,* courts around the country began to apply this three prong test to determine whether a specific accident occurred during the course of embarking or disembarking.[10] *See, e.g., McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313 (1st Cir.1995) (*Day* test applied to find plaintiff was not injured in the course of embarking); *Evangelinos v. Trans World Airlines, Inc.,* 550 F.2d 152 (3d Cir.1977) (*Day* test applied to find plaintiffs were injured during the course of embarking); *Maug-*

*nie v. Compagnie Nationale Air France,* 549 F.2d 1256 (9th Cir.1977) (*Day* test applied to find plaintiff was not injured in the course of disembarking). Due to the intentionally flexible and functional nature of the *Day* analysis, courts have avoided blanket characterizations of which accidents are "always" or "never" covered by Article 17. Instead, a review of the case law reveals that a court's determination hinges upon the specific facts of the case presented and how analogous or distinguishable those facts are from the facts of previously decided cases. An examination of the facts of the instant case, within the rubric of the *Day* test and in light of previous case law, reveals that Dr. Alleyn's accident did occur during the course of disembarking.

The majority of cases that have examined the issue of what is and is not disembarking have narrowly construed the term, denying most accidents the coverage of the Convention. For example, courts have found that plaintiffs were not in the course of disembarking when they were injured in airport terminals. *See Maugnie,* 549 F.2d at 1256 (plaintiff injured when she slipped and fell in area between arrival gate and center of the terminal); *Rabinowitz,* 741 F.Supp. at 441 (plaintiff injured on a moving sidewalk while traveling between two concourses). Both plaintiffs had deplaned, were in control of their own pace, direction, and course of travel through the "common" or "public" area of the terminal and were injured on their way to connecting flights, unaccompanied by airline personnel. *See Maugnie,* 549 F.2d at 1262; *Rabinowitz,* 741 F.Supp. at 446. Both courts also noted that the defendant airlines did not own or lease the terminal

10. Even though the *Day* analysis was created in the context of an embarkation case, courts have found it equally applicable to disembarking cases. *See, e.g., Martinez Hernandez v. Air France,* 545 F.2d 279, 285 (1st Cir.1976) ("In my opinion, the Second Circuit's holding concerning the embarkation provision of Article 17 is equally applicable to disembarking

cases. . . ."); *Rabinowitz v. Scandinavian Airlines,* 741 F.Supp. 441, 445 (S.D.N.Y.1990) ("[T]his court concludes that Day pertains equally to disembarking cases. That the disembarking situation differs from that of embarking is well accounted for in the tripartite test of Day." (footnote omitted.)).

areas where the accidents occurred. *See Maugnie, id.; Rabinowitz, id.*

Similarly, plaintiffs who were injured after clearing immigration, on their way to or already in baggage claim areas were found to have finished disembarking before their injuries occurred. *See Martinez Hernandez,* 545 F.2d at 279 (plaintiff injured by a terrorist attack in the baggage claim area); *de la Cruz v. Dominicana de Aviacion,* 1989 WL 148660, 22 Av. Cas. (CCH) 17,639 (S.D.N.Y.1989) (plaintiff injured in a hallway between immigration and baggage claim). These courts found determinative the fact that the airlines were no longer exerting control over the plaintiffs or the area of the terminal where plaintiffs were injured. *See 'Martinez Hernandez,* 545 F.2d at 283; *de la Cruz,* 1989 WL 148660, at * ——, 22 Av. Cas. at 17,642.

Finally, two courts declined to extend the Warsaw Convention to injuries occurring on the way to immigration. *See Knoll v. Trans World Airlines, Inc.,* 610 F.Supp. 844 (D.Colo.1985); *Curran v. Aer Lingus,* 17 Av. Cas. (CCH) 17,560 (S.D.N.Y.1982) (J. Leval). In both cases, Article 17 was found not to apply because the area where the plaintiffs were injured was not leased or owned by the airline and, although airline personnel were present in the area, the airline did not exercise any direction or control over the plaintiffs. *See Knoll,* 610 F.Supp. at 846–47; *Curran,* 17 Av. Cas. at 17,562. In the *Curran* case, the district court further noted that no evidence was presented to show that the escalator upon which plaintiff was injured was under the exclusive control of defendant airline nor was there any evidence to suggest that the airline made an effort to segregate its passengers so they "were the only persons using the escalator at the time of plaintiff's accident." *See Curran,* 17 Av. Cas. at 17,561.

Although a majority of the courts that have decided this issue have found plaintiffs were not disembarking when injured, two cases similar to the instant case have found the Warsaw Convention applicable. In *Ricotta v. Iberia Lineas Aereas De Espana,* 482 F.Supp. 497 (E.D.N.Y.1979), the district court held that a plaintiff who fell off a bus that was transporting passengers from the plane to the terminal was injured in the course of disembarking. The plaintiff's plane had just arrived, and the passengers were directed by airline personnel to board a bus owned by the airline which would take them to the terminal building. *See id.* at 498–99. Airline personnel then assisted the passengers off the bus and led them to immigration. *See id.* at 499. Only after passing through immigration were the passengers free to enter "public areas of the airport." *Id.*

The district court noted that plaintiff had just exited the aircraft, was in an area of the airport restricted to arriving passengers and airline personnel, had not yet entered any common terminal area and was acting at the direction of the airline when injured. *See id.* at 500. The district court then found that since the plaintiff "had neither reached a safe point inside the terminal nor left the control of Iberia personnel," she was injured in the course of disembarking. *Id.* (applying the Warsaw Convention's two year statute of limitations to bar the suit); *see also Lyons v. American Trans Air, Inc.,* 231 A.D.2d 689, 647 N.Y.S.2d 845 (2d Dep't 1996) (plaintiff who fell in a corridor on her way to customs was found to have been injured in the course of disembarking because she was being escorted by airline personnel down a restricted access corridor; Warsaw Convention's two year statute of limitations applied to bar her claim).

The facts here mirror the facts of cases where the Warsaw Convention was found to apply. The parties' Rule 56(1) statements reflect that at the time of her accident, Dr. Alleyn had just deplaned and was on her way to immigration. Far from being free to roam the public areas of the terminal, she and her fellow passengers were being led along a restricted access corridor directly to the immigration check-

point. These corridors were designed to limit access to arriving passengers and airline personnel only. The line of people Dr. Alleyn was a part of was being lead through the corridor by an employee of Argenbright Security, an agent of Delta Air Lines. Unlike *Curran* and the other cases which denied Article 17 coverage, here Delta did lease, operate and exclusively control the area where Dr. Alleyn was injured. Delta also made a concerted effort to keep its arriving international passengers segregated from other newly arrived passengers, as well as the general public. At the time of Dr. Alleyn's accident, escalator #3 was being used solely by arriving passengers from Flight 149.

Since Dr. Alleyn's injuries occurred before she had reached the common terminal area, while she was still under the control of Delta Air Lines and acting on its instruction, her accident occurred within the course of disembarking an international flight and is covered by Article 17 of the Warsaw Convention. Delta's liability is therefore limited to $75,000, according to Article 22 of the Convention, as modified by the Montreal Agreement.[11]

### (2)

### *Does the Warsaw Convention Also Limit the Liability of MMantec and S & M?*

■ Although the policy behind the Warsaw Convention—namely to fix carrier liability for accidents occurring during international air travel and to promote uniformity in actions against carriers, *see Reed v. Wiser*, 555 F.2d 1079, 1092 (2d Cir.1977)—mandates the application of Article 17 to limit Delta's liability in this case, these same policy considerations have no application to the claims against MMantec and S & M. These defendants should not be permitted to use the Warsaw Convention to shield them from plaintiffs' state law liability claims because doing so would enlarge the coverage of the Convention beyond its reasonable and intended scope.

In the leading decision on this issue, *Reed v. Wiser, id.*, the Second Circuit held that the Warsaw Convention barred plaintiffs from collecting damages from the employees of a carrier greater than the limitation imposed by the Convention. In *Reed*, personal representatives, heirs and next of kin of passengers killed in a plane crash personally sued TWA's President and Vice–President of Audit and Security. *See id.* at 1081. Judge Frankel in the Southern District of New York had refused to apply the Warsaw Convention's aggregate liability limitation to these executives. *See Reed v. Wiser*, 414 F.Supp. 863 (S.D.N.Y.1976). After an extensive review of the enactment of, purposes behind and debate surrounding the Warsaw Convention, the Second Circuit reversed, holding that "plaintiffs may not recover from an air carrier's employees or from the carrier and its employees together a sum greater than that recoverable in a suit against the carrier itself as limited by the Warsaw Convention." *Reed*, 555 F.2d at 1093.

Pervasive throughout the Second Circuit's decision was the concern that the liability limitations imposed by the Warsaw Convention to protect carriers would be circumvented if plaintiffs were allowed to sue a carrier's employees for an unlimited amount of money. *See id.* at 1089. The court's concerns were based on the fact that "[m]ost carriers, at their employee's insistence, provide ... indemnity protection." *Id.* at 1090. Allowing "a suit for an unlimited amount of damages against a carrier's employees ... would unquestionably undermine [the] purpose behind Article 22, since it would permit plaintiffs to recover from the carrier through its employees damages in excess of the Conventions' limits." *Id.* at 1089. The framers' intent to use the Convention to provide international carriers a degree of certainty regarding liability would be violated if plaintiffs could avoid the limitations by suing employees directly. *See id.* at 1090–

---

11. Approved by the Civil Aeronautics Board, 31 Fed.Reg. 7302 (May 13, 1996).

91. The Second Circuit also spent some time discussing the Hague Protocol, a set of proposed amendments to the Warsaw Convention which would expressly include a carrier's employees and agents in the Convention's damages limitation. *See id.* at 1085–87. To date, however, the United States has not ratified this Protocol. *See id.* at 1086.

Later courts have interpreted the holding in *Reed* to support including agents of a carrier, as well as employees, under the Convention. *See, e.g., Lerakoli, Inc. v. Pan Am. World Airways, Inc.,* 783 F.2d 33, 36 (2d Cir.1986); *Waxman v. C.I.S. Mexicana de Aviacion, S.A. de C.V.,* 13 F.Supp.2d 508, 513 (S.D.N.Y.1998); *In re Air Disaster at Lockerbie, Scotland on Dec. 21, 1988,* 776 F.Supp. 710, 712–13 (E.D.N.Y.1991). These cases have, however, limited the extension of the Convention to agents of the carrier that "perform services in furtherance of the contract of carriage, and to those agents performing services within the scope of the Convention that the airline is otherwise required by law to perform." *In re Air Disaster at Lockerbie,* 776 F.Supp. at 714. Since international air carriers are required by the Federal Aviation Administration to provide security checkpoints and searches in connection with international travel,[12] security personnel conducting these searches have been held to be entitled to the liability limitations of the Warsaw Convention. *See, e.g., id.* at 714; *Kabbani v. International Total Servs.,* 805 F.Supp. 1033, 1039 (D.D.C.1992); *Baker v. Lansdell Protective Agency, Inc.,* 590 F.Supp. 165, 170–71 (S.D.N.Y.1984).

While providers of airline security have been the only agents covered by the Convention because they perform a duty required by law, a more diverse group of agents have been protected for performing services within the furtherance of the contract of carriage. For example, the Southern District of New York in *Waxman* held that a subcontractor cleaning company was entitled to invoke the Warsaw Convention in a suit involving an injury caused by the negligent cleaning of a plane. 13 F.Supp.2d 508. The district court found that keeping a plane clean was a service the carrier was bound to perform under the contract it made with its passengers. *See id.* at 515. The district court also espoused its fear that if contractors were not covered by the Convention they would demand indemnity agreements, forcing the carrier to ultimately pay more in damages than the Convention provides for. *See id.* at 514. These considerations led to an application of the Warsaw Convention. *See also Chutter v. KLM Royal Dutch Airlines,* 132 F.Supp. 611, 613 (S.D.N.Y.1955)(pre*Reed* case which found service company that provided the plane's entrance ramp was covered by the Convention because its services were a part of the "contract of transportation"); *Johnson v. Allied Eastern States Maintenance Corp.,* 488 A.2d 1341 (D.C.1985) (a skycap company found to be covered by the Convention because putting a passenger on a plane was a service performed in furtherance of the contract of carriage); *Lear v. New York Helicopter Corp., et al.,* 190 A.D.2d 7, 597 N.Y.S.2d 411 (2d Dep't 1993) (sister and parent company of the carrier that inspected, maintained and repaired helicopter covered by the Convention); *Julius Young Jewelry Mfg. Co., Inc. v. Delta Air Lines,* 67 A.D.2d 148, 414 N.Y.S.2d 528 (1st Dep't 1979) (an inter-line baggage transfer company found to be covered by the Convention because getting luggage to passenger's final destination was a service performed in furtherance of the contract of carriage).

12. Federal statute requires carriers to prescribe or continue in effect reasonable regulations requiring that all passengers and all property intended to be carried in the aircraft cabin and in air transportation or intrastate air transportation be screened by weapon-detecting procedures or facilities employed or operated by employees or agents of the air carrier, intrastate air carrier, or foreign air carrier prior to boarding the aircraft for such transportation. 49 U.S.C. § 1356(a).

On the facts of the instant case, it would be a distortion of the Convention to allow MMantec and S & M to bootstrap their claims of limited liability onto the protection afforded Delta. Although agents of Delta, there was no law requiring any of these defendants to perform the services they did. Nor was Delta required by law to lease the space it maintained from the Port Authority. Presumably, it could have used space leased by one of the other international carriers; therefore, neither MMantec nor S & M should be shielded from liability by the Warsaw Convention.

The defendants rightfully point out that international air carriers are required under 19 C.F.R. § 122.174(a)(1)(ii) to "maintain total control of all passengers ... being discharged from the aircraft to ... Customs." This regulation, however, cannot reasonably be read to legally mandate the leasing of terminals and the hiring of escalator maintenance companies. This regulation simply cannot be stretched so far as to justify limiting the plaintiffs' right of full recovery against these terminal maintenance and repair companies.

More importantly, neither of these companies was performing a service that can fairly be said to be a necessary part of the contract of carriage. Unlike the cases cited above, the services performed by these two defendants were not flight related. They were terminal maintenance services, which included maintaining the escalator Dr. Alleyn was riding on when injured. It was purely fortuitous that the escalator which malfunctioned harmed a Delta international passenger. This type of accident could have just as easily been suffered by a passenger on the Swiss Air flight that was at that moment being held back to allow Delta's flight to pass or been suffered by another passenger deplaning while under the control of any one of a half dozen other airlines which use escalator # 3 on their way to the immigration and customs area. Had either of these scenarios occurred, MMantec and S & M would concededly receive no protection from the Convention's damages limitation.

Moreover, from a policy point of view, the reasons for protecting agents of carriers have no applicability here, and it is unjust as well as logically senseless to allow these companies to hide behind the Warsaw Convention when the carrier—the one the Convention set out to protect—is not at risk of increased liability. Refusing to protect MMantec and S & M does no harm whatsoever to Delta. Delta is not under any obligation to indemnify MMantec or S & M. Indeed, the reverse is the case. Therefore, concerns about possibly circumventing the Convention's strict liability limitation have no relevance. On the contrary, MMantec and S & M are bound by contract to indemnify Delta and probably by common law to hold Delta harmless. Additionally, there is no risk here of Delta suffering from higher priced contracts or additional indemnification agreements in the future; these escalator maintenance companies regularly confront the risk of liability for accidents as a result of their work and have insurance for just these occasions. Had Delta's own security guard been injured instead of Dr. Alleyn, these defendants could not raise the defense of limited liability. The Warsaw Convention's purpose—to fix and predict carrier liability—is not impeded by refusing to allow Delta's umbrella to cover MMantec and S & M. On the contrary, restricting the Convention's limited liability to Delta ensures that its central purpose remains paramount.[13]

**13.** *El Al Israel Airlines v. Tsui Yuan Tseng* also supports this determination. —— U.S. ——, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). In the decision, Justice Ginsburg states, " 'the Convention's preemptive effect on local law extends no further than the Convention's own substantive scope.' " *Id.* at 673 (quoting the Brief for the United States as Amicus Curiae at 16). Thus, an airline would "indisputably" be subject to a state law cause of action for injuries sustained by a passenger on a malfunctioning escalator, provided the accident did not occur on the aircraft or in the course of embarking/disembarking. *See id.* Delta is

### (3)
### *Claim of Willful Misconduct*

Plaintiffs also argue that should the Warsaw Convention be found to apply to any of the defendants, Article 25's willful misconduct exception eliminates the liability limitation. Since the Warsaw Convention is inapplicable to MMantec and S & M, this issue need only be addressed with regard to Delta.[14]

Plaintiffs' argument for finding Delta guilty of willful misconduct is weak. There is no evidence on the record that supports the claim that Delta did or omitted to do anything knowing that such act or omission would probably result in damage, danger or injury. *See Berner v. British Commonwealth Pacific Airlines, Ltd.,* 346 F.2d 532, 536–37 (2d Cir.1965) (citing *Pekelis v. Transcontinental & Western Air, Inc.,* 187 F.2d 122, 124 (2d Cir.1951)); *see also Ospina v. Trans World Airlines,* 975 F.2d 35, 37 (2d Cir.1992) (plaintiffs trying to prove willful conduct through omission must prove defendant acted "(1) with knowledge that the omission of that act probably would result in damage or injury or (2) in a manner that implied a reckless disregard of the probable consequences." (citation omitted)). While there is some evidence that S & M made MMantec aware of the need to replace existing start/stop switches on the escalators, *see* Aff. of Patrick A. Carrajat, Exs. 3, 12, there is no evidence that Delta knew of the deficiency and chose to do nothing about it. There is similarly no evidence that Delta recklessly omitted to do anything. There

is also no evidence indicating a connection between these start/stop switches and Dr. Alleyn's accident. Simply put, there is nothing in the record that warrants finding willful misconduct on the part of Delta.

### Conclusion

Since Dr. Alleyn's accident did occur during the course of disembarkation and there is no evidence on the record from which a reasonable jury could conclude Delta is guilty of willful misconduct, Delta's defense of limited liability is sustained. Furthermore, the Warsaw Convention does not protect MMantec or S & M because the services they performed were not in furtherance of Delta's contract of carriage, nor were they performed under mandate of law. Accordingly, defendant Delta's motion for summary judgment is granted and its total liability fixed at $75,-000 under the Warsaw Convention, as modified by the Montreal Agreement. Both MMantec and S & M's motions for partial summary judgment are denied.

SO ORDERED.

---

only relieved from state law liability here because Dr. Alleyn was injured while disembarking, thus placing her claim against the airline within the Convention's substantive scope. The fact that Dr. Alleyn was disembarking, however, does not automatically put MMantec and S & M within the Convention. To be included, these agents must have been performing services in furtherance of the contract of carriage. Therefore, since these defendants' services were not carrying out Delta's contract of carriage, they "indisputably" remain subject to liability under local law.

**14.** Even if it were found that MMantec & S & M were somehow covered by the Warsaw Convention, there would be at least a question of fact whether or not the servicing of escalator # 3 qualifies as willful misconduct. Only two days before the accident in question, eighteen steps on escalator # 3 were repaired/replaced by using cannibalized parts from another out-of-service escalator. Whether these repairs were completed in such a way as would indicate knowledge of or reckless disregard of probable injury cannot be decided as a matter of law and is a proper question for the jury.