**Mary McCASKEY, Individually and as Widow, Heir and the Personal Representative of the Estate of Ralph McCaskey Plaintiff,**

v.

**CONTINENTAL AIRLINES, INC., et al. Defendants.**

**No. CIV A G–00–572.**

United States District Court, S.D. Texas, Galveston Division.

Aug. 17, 2001.

Steven E Holden, Attorney at Law, Michael S Ashworth, Attorney at Law, Bruce A McKenna, Attorney at Law, Tulsa, OK, for Mary McCaskey, Ralph McCaskey, The Estate of, plaintiffs.

Nicholas E Zito, Ramey Chandler et al, Houston, TX, James Richard Watkins, Royston Rayzor et al, Galveston, TX, for Continental Airlines Incorporated, John Doe Pilot, Gordon Bethune, defendants.

William Lee Maynard, Beirne Maynard & Parsons, Houston, TX, for John Doe Physician aka Douglas Dang, Dr., defendants.

Mary C Harlan Brooksby, Goodwin Raup PC, Phoenix, AZ, Stephen Robert Lewis, Jr, Lewis & Williams, Galveston, TX, William Lee Maynard, Beirne Maynard & Parsons, Houston, TX, for Medaire, defendant.

### ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

KENT, District Judge.

Plaintiff brings this lawsuit based upon the October 10, 1998 death of her husband,

which followed a stroke he suffered on September 24, 1998. Now before the Court are Motions for Summary Judgment filed by Defendant Continental Airlines, Inc. ("Continental"), Defendant Erik Moerman ("Captain Moerman"), Defendant Gordon Bethune ("Bethune") and Defendant MedAire, Inc. ("MedAire").[1] For the reasons stated below, Continental's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART** and Captain Moerman's Motion for Summary Judgment is likewise **GRANTED IN PART** and **DENIED IN PART**. Bethune's Motion for Summary Judgment is **GRANTED**. MedAire's Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

On September 24, 1998, Plaintiff, Mary McCaskey, and her husband, Ralph McCaskey, were to travel on Continental Airlines from their home in Tulsa, Oklahoma to Frankfurt, Germany.[2] In order to reach Frankfurt, the McCaskeys were scheduled to fly from Tulsa to Houston, Texas. They were then scheduled to board Continental Flight 50 from Houston to Frankfurt with a stopover in Newark, New Jersey. However, the Tulsa to Houston flight was delayed such that the McCaskeys were unable to board the Frankfurt bound aircraft in Houston. Instead, they boarded Continental Flight 1476 bound for Newark, from which point they were scheduled to literally "catch" their international flight to Frankfurt, which was waiting on the ground in Newark with a scheduled departure time of 8:05 p.m.[3]

While in Houston, Mrs. McCaskey alleges that she and her husband were treated rudely by a Continental gate attendant who forcefully ripped apart their boarding passes, exchanging them for new ones, while also advising the couple that they would not be seated together on their flight from Newark to Frankfurt. The combination of their initial flight delay, along with the various examples of poor treatment received in Houston, is said to have caused both Mrs. McCaskey and her husband severe stress.

The McCaskeys did ultimately board Flight 1476 in Houston. They were seated together in Row 8. At some point, either shortly before or shortly after pushing away from the gate, Plaintiff alleges that it was "very warm" aboard the aircraft. Specifically, Mrs. McCaskey testified in her deposition that "[b]efore we took off, when we were seated on the plane, there was a problem with the air-conditioning. And they announced that they were working on the air-conditioning problem and that hopefully that they would know fairly soon if it was going to be, you know,

1. Some arguments advanced in favor of summary judgment are common to all Defendants. In such cases, the Court will refer to the "Defendants," as encompassing all four. Several contentions, however, are common to less than all the Defendants, in which cases the Court refers to the Defendants by name.

2. Many of the facts set forth are fiercely controverted by the Defendants. Because this is a Motion for Summary Judgment, however, the Court's presentation is intentionally colored by its obligation to defer to Plaintiff's proffered evidence. In places of particular controversy the Court attempts to call attention to these disputes, but because of the sheer volume of evidence presented, the Court may not always do so.

3. Plaintiff suggests that the she and her husband would have been arriving in Frankfurt at a different time or on a different flight. According to Plaintiff, she and her husband were stressed by this possibility. Defendant Continental makes much of the fact that this was not the case, as the McCaskeys' were still scheduled to arrive in Frankfurt via Flight 50. Continental is correct, but this is hardly fatal to Plaintiff's case.

fixed." [4] Mrs. McCaskey further testified by affidavit that "the plane started to become very, very hot. Ralph and I were perspiring." [5]

First Officer Charles Yeagle explained in his deposition that it was a warm, sunny day in Houston, and that upon pushing back from the gate the cockpit received an "over temp" warning from a sensor on the right wing. An over temp warning indicates that the outer skin of the aircraft has become overheated. Continental's testimony indicates that the combination of the sun heating the aircraft and the heat generated by the right "air pack" likely caused this condition. [6] As a consequence, the crew had to shut down airflow into the cabin in order to correct the problem. Although this over temp problem may not have been caused by a malfunctioning air pack per se, it seems undisputed that the crew did have to shut down the aircraft's cooling system for some indeterminate period of time, during which time the aircraft almost surely heated at least somewhat. [7]

Continental, however, downplays the significance of the over temp problem and any related heating of the aircraft. According to Continental, upon receiving a "wing body" over temp signal in the cockpit, the crew simply switched from the overheating air pack on the right wing to an air pack on the left wing. Continental argues that this provides the same flow of air through the aircraft. However, First Officer Yeagle's testimony, on which Continental bases its argument, is not so unequivocal. When asked if the left wing air pack would provide the same air flow, First Officer Yeagle responded "basically."

Shortly thereafter, ground maintenance successfully advised the crew how to correct the over temp condition, and the plane entered the line for take off. Defendants argue that, despite any alleged problems, Flight 1476 was "wheels up" in twenty-six minutes, which was just six more minutes than the average time for Continental 737 flights in Houston during the year 1998. Nonetheless, Captain Moerman agreed during his deposition that it was fair to estimate that the departure of Flight 1476 was delayed ten to twenty minutes due to the over temp situation.

Tragically, sometime after departing Houston on Flight 1476, Plaintiff's husband, Ralph McCaskey, suffered a stroke. The evidence is highly convoluted on where precisely the aircraft was when Mr. McCaskey began to exhibit symptoms. Plaintiff has introduced some testimony that it occurred as soon as thirty minutes after departure and thus presumably over Texas or Louisiana. Other persons have

---

4. Plaintiff also supplies corroborating affidavits: (1) Bonnie Wagoner, a passenger seated next to Mrs. McCaskey, stated that it was "unusually warm and uncomfortably hot," and (2) Jan Bloomfield testified that "[p]rior to takeoff, there was an announcement regarding mechanical difficulty with the plane. This seemed to impact the flow of air and the plane became very warm/hot."

5. The Defendants point out some inconsistency in Mrs. McCaskey's testimony. Contrary to her affidavit, in her deposition Mrs. McCaskey stated that although she was sweating aboard the aircraft, she did not recall seeing sweat on her husband.

6. Although not entirely clear to the Court, an air pack is seemingly nothing more than an air conditioning unit.

7. Plaintiff introduces what are ostensibly National Weather service observations indicating that the high temperature on September 24, 1998 at Houston Intercontinental Airport was 94 degrees Fahrenheit. Indisputably, the flight took off in "the heat of the day," at 2:44 p.m. after pushing away from the gate at 2:18 p.m.

generally placed the aircraft over Mississippi or somewhere near Atlanta, Georgia.[8]

Upon Mr. McCaskey's beginning to exhibit stroke-like symptoms, the Continental crew requested the assistance of any persons aboard with medical training. Two passengers came forward to assist, including a registered nurse who appears to have taken control of the situation. Additionally, as is common in the airline industry, Continental had a contract with a company, here Defendant MedAire, to provide medical advice in the event of in-flight medical emergencies. MedAire employs physicians who, based upon the information provided to them, assess the medical situation from afar. MedAire then makes recommendations to the flight crew regarding care of the ill traveler and possible flight diversions. On September 24, 1998, as much as twenty-five minutes after Mr. McCaskey's symptoms became manifest, Continental contacted MedAire and sought and received advice regarding how to proceed in light of Mr. McCaskey's medical situation.[9]

Captain Moerman first spoke with a "communications specialist" with MedAire. The Captain advised MedAire that a 78-year-old male aboard the aircraft "may have suffered a slight stroke." Captain Moerman further advised MedAire that Flight 1476 was en route to Newark and provided the estimated arrival time. MedAire then inquired about Mr. McCaskey's symptoms, at which point Captain Moerman deferred to the nurse who had been attending Mr. McCaskey.[10]

MedAire then patched the nurse through to Dr. Douglas Dang ("Dr. Dang" or "Doctor").[11] The nurse began by describing Mr. McCaskey's symptoms to the Doctor. She indicated that his right side was weak, and his pupils were a bit dilated. Further, Mr. McCaskey had some right side facial drooping. Mr. McCaskey could not speak much, but was responding with yes or no head movements when asked questions. The nurse also informed Dr. Dang that Mr. McCaskey had a history of heart problems but that he did not have high blood pressure or diabetes. At this point, Mr. McCaskey had been placed on oxygen.[12] His pulse rate was 70 to 80 and regular.

Dr. Dang immediately acknowledged the possibility that Mr. McCaskey had suf-

8. Similarly, it is equally unclear how long remained before the flight was scheduled to arrive in Newark, its ultimate destination. Estimates generally range from as long as two hours to as short as one and one half hours.

9. The evidence actually indicates that it was certainly some period less than twenty-five minutes. The twenty-five minutes reference referred to by Plaintiff plainly took place after MedAire had already been speaking with the aircraft for some length of time.

10. Plaintiff introduces significant evidence directed to an alleged lack of crew training and responsiveness. The Court declines to summarize all this information. The basic gist of Plaintiff's evidence is that the various crew members did not have adequate medical training, did not follow Continental's medical emergency procedures, and did not communicate properly with one another. Continental strongly contests the facts supporting these conclusions, but suffice it to say that Plaintiff has introduced some evidence in support of each its arguments.

11. Dr. Douglas Dang had been a Defendant in this action. However, by Order entered on June 28, 2001, the Court Ordered Plaintiff's claims against Dr. Dang severed and transferred to the United States District Court for the District of Arizona.

12. Plaintiff introduces evidence that the volunteers caring for Mr. McCaskey had to reduce the flow of oxygen below 100% because of concerns about supply. Continental disagrees, contending that four oxygen bottles lasting approximately twenty-five minutes each were utilized at 100% flow.

fered a stroke or possibly a transient ischemic attack. The Doctor asked where the aircraft was presently located, but, perhaps crucially, did not receive an answer. Then, Dr. Dang suggested that the crew "kind of watch him a little and see if he gets worse or better." The Doctor then authorized the release of the medical kit so that Mr. McCaskey's blood pressure could be taken and his symptoms reevaluated. Some period of time then passed, after which the nurse and Dr. Dang again spoke. The nurse provided the blood pressure readings and indicated that Mr. McCaskey's condition was "about the same."

At this point, Dr. Dang informed the nurse, but notably not the flight crew, that he believed the aircraft was only about 45 minutes from Newark and that they should continue to observe Mr. McCaskey and give him some aspirin. Dr. Dang further indicated that "I don't think we need to divert the flight." Captain Moerman acknowledges that if Dr. Dang believed the aircraft to have been only forty-five minutes from Newark the Doctor was incorrect.

After this, Dr. Dang again spoke with Captain Moerman. The Doctor indicated that Mr. McCaskey would likely be okay, but recommended expediting arrival into Newark. MedAire would arrange to have medical personnel waiting at the gate. Thus, Flight 1476 continued on to its planned destination of Newark, New Jersey.

The decision on whether to divert or proceed was unquestionably the Captain's. He could have overridden a MedAire recommendation. However, it seems unquestioned that the Captain was not directly apprised, beyond generalizations, of the symptoms underlying Dr. Dang's diagnosis and decision. More importantly, perhaps, it seems certain that the Captain did not appreciate Dr. Dang's misapprehension of the aircraft's present position.[13]

Upon arriving in Newark, Plaintiff and her husband sought medical attention and did not board their international flight. Mr. McCaskey spent approximately two weeks in the hospital. Then, on October 10, 1998, while aboard a train returning to Tulsa from New Jersey, Mr. McCaskey died, allegedly from complications attributable to the September 24 stroke.

On September 22, 2000, Plaintiff filed suit against Continental and others. Soon thereafter, on October 5, 2000, Plaintiff amended her Complaint, adding MedAire as a Defendant in this action. Plaintiff's Complaint states claims under state law for negligence and wrongful death on behalf of her husband, and, in her own behalf for: intentional infliction of emotional distress, a bystander mental distress claim, and a Texas Deceptive Trade Practices Act claim.

## II. ANALYSIS

### A. *Summary Judgment Standard*

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the nonmoving party must set forth specific facts

---

**13.** This communications gap is important, because the testimony appears to establish that irrespective of where the aircraft was located along its route, it would take at least thirty minutes to get it on the ground at an appropriate airport. Thus, if Dr. Dang thought Flight 1476 was forty-five minutes from Newark, it may have made sense to continue to Newark even in an emergency.

showing that there is a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Issues of material fact are "genuine" only if they require resolution by a trier of fact. *See id.* at 248, 106 S.Ct. at 2510. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. Only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *See id.* at 247–48, 106 S.Ct. at 2510. If the evidence is such that a reasonable fact-finder could find in favor of the nonmoving party, summary judgment should not be granted. *See id.; see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Dixon v. State Farm Fire & Cas. Co.,* 799 F.Supp. 691 (S.D.Tex.1992) (noting that summary judgment is inappropriate if the evidence could lead to different factual findings and conclusions). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. *See Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

B. *Warsaw Convention*

The Warsaw Convention ("Convention") is an international treaty covering "all international transportation of persons, baggage, or goods performed by aircraft for hire." *El Al Israel Airlines, Ltd. v. Tseng,* 525 U.S. 155, 162, 119 S.Ct. 662, 668, 142 L.Ed.2d 576 (1999). Article 17 of the Convention establishes the conditions under which an airline may be liable for the personal injuries of passengers:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage

so sustained took place on board the aircraft or in the course of embarking or disembarking.

Thus, in order to prevail on a claim under the Convention a plaintiff must prove that: (1) an "accident," (2) "took place on board the aircraft or in the course of operations of embarking or disembarking," (3) which "caused,"(4) an "injury." *See Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 535–36, 111 S.Ct. 1489, 1494, 113 L.Ed.2d 569 (1991).

In addition to the above elements, there is also a threshold requirement that the accident occur during international transportation. The parties do not dispute this here as the Convention covers domestic legs of international travel. *See Lemly v. Trans World Airlines, Inc.,* 807 F.2d 26, 27 (2d Cir.1986); *cf. also Potter v. Delta Air Lines, Inc.,* 98 F.3d 881, 882–84 (5th Cir.1996) (applying the Convention without discussion to an incident occurring on the domestic leg of an international trip).

The Convention, moreover, "creates the exclusive cause of action and the exclusive remedy for all international transportation of persons performed by aircraft for hire." *Potter,* 98 F.3d at 887 (rejecting the plaintiff's argument that because no accident had occurred, the plaintiff could resort to state law causes of action); *accord Tseng,* 525 U.S. at 176, 119 S.Ct. at 675. Therefore, if a plaintiff cannot recover under the Convention no other remedy is available. *See Potter,* 98 F.3d at 887.

The four prima facie elements set forth above thus serve as a "gateway" of sorts. If a passenger is able to establish these elements, the passenger may recover damages. Indeed, the carrier is deemed liable, without fault, for up to $75,000 in damages. *See In re Air Crash Disaster Near Warsaw, Poland,* 979 F.Supp. 164, 167

**570**

(E.D.N.Y.1997). Under Convention Article 25, however, a plaintiff may only recover damages in excess of $75,000 by demonstrating that "the damage is caused by [the carrier's] wilful misconduct or by such default on [the carrier's] part as, in accordance with the law of the court to which the case is submitted, is considered to be equivalent to wilful misconduct."

In the present matter, the Defendants maintain, first, that no "accident" occurred. Relatedly, the Defendants argue that even if an accident did occur, the accident did not "cause" Mr. McCaskey's stroke or subsequent death. Finally, with respect to Mrs. McCaskey's claims for personal injury brought on her own behalf, Defendants contend that she has not suffered a compensable "physical injury."

### 1. *Accident*

■ "The essential predicate of carrier liability is the occurrence of an 'accident' contemplated by Article 17 of the Convention." *Wallace v. Korean Air,* 214 F.3d 293, 297 (2d Cir.2000), *cert. denied,* — U.S. ——, 121 S.Ct. 1079, 148 L.Ed.2d 955 (2001). The Supreme Court has defined an accident as "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks,* 470 U.S. 392, 405, 105 S.Ct. 1338, 1345, 84 L.Ed.2d 289 (1985). Courts should "flexibly" apply this definition after an "assessment of all the circumstances surrounding a passenger's injuries." *Id.* In this regard, the Supreme Court cited with approval an array of lower court cases which had "broadly" interpreted the accident requirement. *See id.* Thus, "[i]n cases where there is contradictory evidence, it is for the trier of fact to decide whether an 'accident' . . . caused the passenger's injury." *Id.*

Accordingly, a tremendous array of factual situations have been held to constitute accidents under the Warsaw Convention. *See Wallace,* 214 F.3d at 299–300 (sexual assault by a fellow passenger); *Fishman v. Delta Air Lines, Inc.,* 132 F.3d 138, 142 (2d Cir.1998) (scalding passenger with hot compress intended to relieve earache); *Turturro v. Continental Airlines,* 128 F.Supp.2d 170, 178 (S.D.N.Y.2001) (failure to return promptly to gate and also airline employee's inflammatory comments about a passenger); *Husain v. Olympic Airways,* 116 F.Supp.2d 1121, 1131 (N.D.Cal. 2000) (failure to reseat smoke sensitive passenger away from smoking section).

■ In all cases, however, Article 17 mandates that an accident cause the passenger's injury. *See Saks,* 470 U.S. at 398, 105 S.Ct. at 1342. Thus, a plaintiff cannot establish an accident simply because he or she has suffered an injury. *See id.* In other words, the injury itself is not an accident. Accordingly, "accident" does not "cover routine travel procedures that produce an injury due to the peculiar internal condition of a passenger." *See id.* at 405, 105 S.Ct. at 1345.

■ Plaintiff points to several events, which she maintains constitute "accidents" within the meaning of the Warsaw Convention. The Court will mention each in approximate sequence. First, Plaintiff indicates several events prior to the McCaskeys boarding Flight 1476, which are said to constitute accidents, or a collective accident. In this regard, Plaintiff directs the Court to both the individual and cumulative effects of: (1) the McCaskeys' unexpected delays between Tulsa and Houston, (2) the allegedly rude treatment the McCaskeys' received from a Continental gate attendant in Houston, (3) the forceful ripping up of the McCaskeys' tickets at the gate in Houston, and (4) the advisement by Continental that the couple would likely not be seated together on their flight from Newark to Frankfurt.

The Court will refer to this group as the "comportment" incident. Obviously, these actions were external to the McCaskeys. They had no control over the manner in which they were treated. Thus, Plaintiff argues, as she must, that treating several elderly passengers rudely is an unexpected or unusual event.[14] At first blush, one's reaction must, of course, be that delays and rudeness are *expected* and *usual* events in air travel. However, this scenario does not fall within the reach of cases which exclude injuries from, for example, the normal pressurization of an aircraft. *See, e.g., Saks*, 470 U.S. at 394–95, 105 S.Ct. at 1340. And, indeed, several courts have found "comportment" type allegations sufficient to constitute an accident under Article 17. *See Turturro*, 128 F.Supp.2d at 178; *Husain*, 116 F.Supp.2d at 1131.

For example, in *Turturro*, a passenger with a long-standing fear of flying realized her anti-anxiety medicine had been stolen in the airport. *See* 128 F.Supp.2d at 173. Accordingly, she advised the flight crew, while still at the gate, that she needed to leave the aircraft. *See id.* The crew refused and the passenger became severely agitated, repeatedly calling "911" from her cellular telephone and begging for help. *See id.* After the police contacted the pilot, the plane returned to the gate. *See id.* An airline employee then announced over the loudspeaker that an " 'unruly' "

passenger was leaving the plane. *See id.* The district court there held that "the 'accident' included Continental's act of delaying the return ... to the gate and its employees' comments directed to plaintiff and to fellow passengers." *Id.* at 178.

Similarly, another district court has held that a flight attendant's three refusals to move a passenger to another seat constituted an accident. *See Husain*, 116 F.Supp.2d at 1131. In *Husain*, the passenger had a severe smoke allergy and was seated near the smoking section on an international flight. *See id.* at 1125. Despite being advised of this concern several times, the flight attendant failed to move the passenger, and even lied about the availability of empty seats. *See id.* at 1133. The passenger later suffered a severe asthma attack and died. *See id.* at 1128.

It appears that the type of "comportment" event urged by Plaintiff to constitute an accident expands the concept further than it has, to date, been taken. However, whether this Court agrees with Plaintiff's characterization of these incidents as unusual, is of no moment, for it is the finder of fact's duty to make this decision.

Plaintiff next directs the Court to one event occurring on board the aircraft, and prior to the onset of Mr. McCaskey's stroke. Flight 1476 experienced an "over

14. Defendant MedAire cites the Court to the Fifth Circuit's *Potter* opinion, in which the Fifth Circuit held that "a rude, hostile passenger ... *himself* is not an 'event or happening.' " *Potter*, 98 F.3d at 884 (emphasis added). This case is readily distinguishable. In *Potter*, the plaintiff contended that a man sitting in the row ahead of her had caused a scene earlier in the flight. *See id.* at 883. About one hour into the flight, the plaintiff went to the lavatory. *See id.* Upon returning, she discovered that the "rude" man was asleep and had reclined his seat, making access to her row difficult. *See id.* She asked her husband not to disturb the "intimidating" man. *See id.* As a result, plaintiff injured her knee when she attempted to reenter her seat. *See id.* Crucially, unlike the allegations in this case, the alleged rudeness or hostility was not manifested and directed at the plaintiff. In this regard, by choosing the word "himself" the Fifth Circuit carefully emphasized that the mere fact that one is perceived as rude does not turn one's presence into an event. *Id.* at 884.

temp" situation while waiting to depart Houston on a warm, sunny day. This required the crew to briefly shut down the flow of cooled air to the main cabin.

As discussed above, Continental downplays the significance of the over temp problem. According to Continental, upon receiving a wing body over temp signal in the cockpit, the crew simply switched from the air pack on the right wing to an air pack on the left wing. This provided "basically" the same flow of air through the aircraft. Moreover, Continental contends that the time from pushback to takeoff was approximately the same as the average for aircraft of this type.

Continental's argument here misses the point, by basically confusing causation with the occurrence of an accident, which although difficult to parse, are distinct inquiries. The question here is whether an unusual event occurred, not whether the event actually led to a stroke. Even if the cabin did not heat up and the flight was not inordinately "delayed" between push back and takeoff, there could have been an accident.[15] In any event, Captain Moerman testified that Flight 1476 was delayed ten to twenty minutes due to the over temp situation. Plaintiff provides ample evidence from which a jury could conclude that an accident occurred aboard Flight 1476 prior to takeoff.

Finally, Plaintiff argues that several actions or inactions after the onset of Mr. McCaskey's stroke also may constitute an accident, including: (1) a lack of sufficient bottled oxygen aboard the aircraft, (2) the failure to divert the aircraft as opposed to proceeding on to Newark, and (3) broadly speaking, the lack of a properly trained flight crew.[16] Thus, Plaintiff reasons that even if the stroke was not caused by an accident, she may nonetheless show that Defendants' post stroke conduct constituted a separate accident causing further injury. The Court agrees that this is possible. *See Fishman,* 132 F.3d at 142.

In *Fishman,* a child began suffering from an earache caused by the change in air pressure during the plane's descent. *See id.* at 140. A flight attendant attempted to alleviate the child's pain by providing a cup with a warm, wet cloth inside to be placed over the child's ear. *See id.* While applying the cup to the ear, scalding water dripped on the child's neck and shoulder causing burns. *See id.* The Second Circuit first determined that the earache was not caused by an accident. *See id.* at 142. This is so because a change in air pressure is routine, rather than unusual. By contrast, however, "an injury resulting from routine procedures . . . can be an 'accident' if those procedures or operations are *carried out* in an unreasonable manner." *Id.* at 143 (emphasis in original). Accordingly, while it may have been routine and usual to apply a hot compress to relieve ear pain, the "measure was carried out in a way (using excessive, scalding water) that was not expected, usual, normal, or routine." *Id.* Thus, an accident occurred, causing burns. *See id.*

Based upon *Fishman,* it seems clear that after the onset of Mr. McCaskey's stroke, Continental could have taken an action that caused him a second injury. Plaintiff alleges that Continental did precisely that. According to Plaintiff, Continental caused Mr. McCaskey's death two weeks later.

---

**15.** It would seem ludicrous, for example, to argue that because a plane which suffered a rapid decompression while in flight later arrived at its destination on time there was no accident.

**16.** As mentioned above, Plaintiff alleges a lack of proper communication, failure to follow procedures and inadequate medical training.

In response, Defendants point to a long line of cases in which an airline's mere failure to act in response to an injury suffered aboard an aircraft does not constitute an accident. *See Krys v. Lufthansa German Airlines*, 119 F.3d 1515, 1519–22 (11th Cir.1997); *Abramson v. Japan Airlines Co., Ltd.*, 739 F.2d 130, 132–33 (3d Cir.1984); *McDowell v. Continental Airlines, Inc.*, 54 F.Supp.2d 1313, 1318–20 (S.D.Fla.1999).

The seminal case in this regard is the Third Circuit's decision in *Abramson*, in which a passenger began suffering an attack from a preexisting hiatal hernia. *See* 739 F.2d at 131. The passenger claimed that he could relieve his attack by a self-help remedy. *See id.* However, this required him to lie down. *See id.* In response to a request for aid, a flight attendant informed the plaintiff's wife, incorrectly, that no empty seats existed. *See id.* Plaintiff filed suit, contending that the airline's failure to aid him in locating a place to lie down constituted an accident which aggravated his injuries. *See id.* The *Abramson* court determined that the plaintiff's injury, suffered during a routine flight, was not caused by an accident. *See id.* at 133.

Similarly, in an Eleventh Circuit case, the plaintiff allegedly suffered a heart attack. *See Krys*, 119 F.3d at 1517. However, a doctor aboard the aircraft examined the plaintiff when he began feeling ill and reported to the crew that there was " 'nothing to worry about.' " *Id.* Accordingly, the flight did not divert. *See id.* The passenger sued claiming that the plane's failure to divert aggravated his injury, which indeed turned out to be a heart attack. *See id.*

The Eleventh Circuit reviewed the case law, including *Abramson*, in reaching its decision on whether an accident occurred. *See id.* at 1520–22. The court determined that the proper approach to ascertain whether an accident occurred is to undertake a bland factual analysis and see if anything unusual aggravated the plaintiff's injury. *See id.* at 1521. Thus, because *Krys* involved an aircraft traveling routinely to its intended destination after the onset of a heart attack, no accident occurred. *See id.* at 1521–22.

The Court finds these cases unpersuasive for several reasons. First, these circuit court decisions were both handed down prior to the Supreme Court's *Tseng* decision, which established that the Warsaw Convention is the exclusive remedy for injuries suffered within its scope. *See* 525 U.S. at 176, 119 S.Ct. at 675. Thus in both *Abramson* and *Krys* the passenger who had arguably been harmed by the negligence of a carrier was not completely deprived of a potential remedy. Indeed, in *Krys* it was the airline, not the passenger, arguing that an accident had occurred. *See Krys*, 119 F.3d at 1518. Moreover, the *Krys* court, after carefully analyzing *Abramson* did not conclude that an accident can never exist post-illness onset. Rather, the court stated that "*Abramson* ... is better explained as turning on a conclusion that the aggravation injury suffered by the plaintiff simply was not caused by 'an unusual or unexpected event or happening external to the plaintiff.' " *Id.* at 1521.

Additionally, the *Abramson* holding, in particular, seems to have been heavily affected by the court's notion that a prerequisite to an accident is an unusual "physical" event common to the entire flight. *See id.* at 132–33. There is no such requirement. *See Wallace*, 214 F.3d at 299–300; *Fishman*, 132 F.3d at 142; *Turturro*, 128 F.Supp.2d at 178; *but cf. Saks*, 470 U.S. at 405, 105 S.Ct. at 1345 (citing *Abramson* with seeming approval of its holding).

Nonetheless, the Court tends to agree with these decisions to the extent that they hold that a failure to divert is not *ipso facto* an accident. However, the notion that a failure to divert can never present a jury question is more than this Court is willing to hold, particularly in light of the Supreme Court's mandate that courts "flexibly" apply the definition of an accident after an "assessment of all the circumstances surrounding a passenger's injuries." *Saks,* 470 U.S. at 405, 105 S.Ct. at 1345. Suppose for example, a passenger inexplicably collapsed and ceased breathing through no initial accident. Thereafter, a medical doctor informs the crew that the passenger's life could be saved, but only if the flight landed within one hour. The plane is within thirty minutes of a suitable airport, but the crew blithely elects to continue on a planned cross-country flight. The notion that this is not an unusual event is staggering. And while the Court's hypothetical does not represent precisely what allegedly occurred on Flight 1476, it is not that far afield of Plaintiff's version of the facts. Thus, a jury should decide this issue, after receiving proper instruction from the Court on the meaning of the term "accident."

In sum, the Court concludes that a reasonable finder of fact could conclude that any or all of these many incidents constitutes an accident within the meaning of the Warsaw Convention. Defendants' Motion for Summary Judgment on the accident issue is **DENIED.**

### 2. *Causation*

Once a passenger has proved that an accident occurred aboard the aircraft or during the operations of embarking or disembarking, the passenger must also establish causation. However, because "[a]ny injury is the product of a chain of causes," the passenger must only "be able to prove that some link in the chain was an unusual or unexpected event external to the passenger." *Id.* at 406, 105 S.Ct. at 1346.

In this regard, the Defendants maintain that even if there was an accident, the accident did not cause: (1) Mr. McCaskey's stroke, (2) Mr. McCaskey's death, or (3) Mrs. McCaskey's own personal injuries.[17] Defendants introduce the affidavit testimony of two physicians who both state, based upon reasonable medical probability, that Mr. McCaskey died from long-standing heart problems, not related to the stroke he suffered aboard Flight 1476.[18]

Plaintiff responds with the affidavit testimony of Dr. John S. Meyer who states that:

[I]t is my professional opinion, to a reasonable medical probability that a number of events ... served to subject Mr. McCaskey to a greater risk of stroke and which resulted ultimately [sic] caused both the stroke and his death ... [including] [t]he fact that the McCaskey's flight arrived late in Houston ... [t]he fact that the McCaskeys had to be rushed through the airport ... [t]he disingenuous treatment of the McCaskey's [sic] by the ticketing agent [and] ... the cabin temperature becoming unusually elevated, causing some of the passengers, including [Mr. McCaskey] ... to sweat. This would also serve to cause Mr. McCaskey to become dehydrated. This combined with the other

---

**17.** The Court discusses below whether Mrs. McCaskey has suffered a compensable "injury."

**18.** The Court notes that Defendants' affidavits are necessarily insufficient because Plaintiff

can recover in this case irrespective of whether a causal link exists to Mr. McCaskey's death, if Plaintiff proves that an accident caused the stroke. Although this would affect both the extent and type of damages available.

factors ... increased the stress being experienced by Mr. McCaskey and would necessarily decrease the supply of oxygen to the blood. This would therefore have the effect of thickening the blood (hemo-concentration) and adversely affecting efficient circulation.

Although confusingly articulated, the Court understands Dr. Meyer's testimony to mean that, to a reasonable medical probability, that stress generated by several of Continental's alleged actions and the elevated temperatures aboard Flight 1476, to a reasonable medical probability caused Mr. McCaskey's stroke. Dr. Meyer further states that, to a reasonable medical probability, the weakening of Mr. McCaskey's body by the stroke caused his subsequent death. Thus, Dr. Meyer has established a prima facie case sufficient for Plaintiff to avoid summary judgment.[19]

### 3. *Physical Injury Requirement*

Finally, the Plaintiff must establish that any accident caused a physical injury. *See Floyd*, 499 U.S. at 552, 111 S.Ct. at 1502. Indisputably, assuming an accident and causation, Mr. McCaskey meets this requirement. The more difficult question surrounds Mrs. McCaskey's ability to recover for her mental anguish injuries.

The key Supreme Court case in this regard is *Floyd*, in which an aircraft was bound for the Bahamas from Miami. *See id.* at 533, 111 S.Ct. at 1492. Shortly after takeoff, the plane experienced mechanical problems and the passengers were informed that the plane would be ditched in the Atlantic Ocean. *See id.* Fortunately, after a rapid descent the crew righted the

aircraft and returned safely to Miami. *See id.* The plaintiff and others sued alleging "damages solely for mental distress." *Id.*

The Court framed the issue before it in two seemingly different, and somewhat contradictory, manners. First, the Court asked "whether Article 17 allows recovery for mental or psychic injuries unaccompanied by physical injury or physical manifestation of injury." *Id.* at 533, 111 S.Ct. at 1492. Second, the Court questioned whether a passenger may recover after suffering "only a mental or psychic injury." *Id.* at 536, 111 S.Ct. at 1494. The Court went on to explicitly answer only the second characterization of the question, holding that "Article 17 does not allow recovery for purely mental injuries." *Id.* at 534, 111 S.Ct. at 1493. Thus, while the decision clearly bars recovery for purely mental injuries, it did not address (1) whether mental injuries could be recovered by a person who had also been physically injured, and also arguably left open (2) whether a person could recover for mental injuries having physical manifestations.

Later, in *Tseng*, the essential issue before the Supreme Court was whether a plaintiff who agreed there had been no "accident" could pursue state law remedies, or if, instead, the Convention provided the exclusive mechanism for recovery. *See* 525 U.S. at 160, 119 S.Ct. at 667. The Court concluded that the Convention does preempt state law and provides the exclusive remedy for passengers. *See id.* at 176, 119 S.Ct. at 675. However, the Court's discussion also noted that the plaintiff alleged only "psychic or psychoso-

---

**19.** Defendants, in voluminous attachments to their Reply Briefs, attack the testimony of Dr. Meyer and others. The Court appreciates the concerns voiced that the Doctor's affidavit testimony is somewhat equivocal. The Court overrules Defendants' objections for now. At a trial on the merits, however, Dr. Meyer must be prepared to present testimony regarding causation by various alleged "accidents" based upon a reasonable medical probability. The Court will not grant summary judgment simply because an affidavit of an apparently as yet undeposed witness is not entirely lucid.

matic injuries, but no 'bodily injury,' as that term is used in the Convention." *Id.* This statement indicated that even if an accident had occurred, the plaintiff would be "unable to recover under the treaty; she sustained no 'bodily injury' and could not gain compensation under Article 17 for her solely psychic or psychosomatic injuries." *Id.* at 172, 119 S.Ct. at 673. If this dicta represents the Court's interpretation of *Floyd,* then the second question potentially left open by *Floyd* would require a negative answer. Indeed, most courts have adopted this position, holding that neither psychic nor psychosomatic injuries are recoverable absent a traditional physical injury. *See Carey v. United Airlines,* 255 F.3d 1044, 1052–53 (9th Cir.2001); *Terrafranca v. Virgin Atlantic Airways Ltd.,* 151 F.3d 108, 111 (3d Cir.1998); *but see In re Air Crash at Little Rock, Arkansas,* 118 F.Supp.2d 916, 924 (E.D.Ark.2000) (holding that the evidence indicated that post traumatic stress disorder is a physical injury).

For the reasons that follow, however, the Court need not reach, at this juncture, whether Mrs. McCaskey can recover directly for any solely psychic or psychosomatic injuries, because these injuries are available to Mrs. McCaskey irrespective of the precise nature of her own injuries. This is so because, Mr. McCaskey's physical injury, if caused by an accident satisfies the "gateway" bodily injury requirement.

In *Zicherman,* the Court considered whether the Convention allowed damages for loss of society of a relative. *See Zicherman v. Korean Air Lines Co., Ltd.,* 516 U.S. 217, 221, 116 S.Ct. 629, 632, 133 L.Ed.2d 596 (1996). Generally, the Convention permits recovery of "damage sustained" once a compensable accident causing physical injury has been established.[20] *See id.* Justice Scalia explained that:

> [i]t is obvious that the English word 'damage' ... can be applied to an extremely wide range of phenomena, from the medical expenses incurred as a result of [the passenger's] injuries (for which every legal system would provide tort compensation) to the mental distress of some stranger who reads about [the passenger's] death in the paper (for which no legal system would provide tort compensation).

*Id.* at 221–22, 116 S.Ct. at 632.

Justice Scalia then turned to how a court should ascertain what damages are available within this spectrum. The answer to this question is supplied by determining what damages are "legally cognizable" under the "domestic law" of the forum court. *See id.* at 224–25, 116 S.Ct. at 633–34. Thus, domestic law establishes "who may bring suit and what they may be compensated for." *Id.* at 225, 116 S.Ct. at 634.

The next question, of course, becomes what domestic law? Again, the Supreme Court supplied the answer. "Articles 17 and 24(2) provide nothing more than a pass-through, authorizing us to apply the law that would govern in the absence of the Warsaw Convention" *Id.* at 229, 116 S.Ct. at 636. In *Zicherman,* because the passenger was killed over the Sea of Japan, the answer was the Death on the High Seas Act, 46 App.U.S.C. § 761. Here, the law that would apply in the absence of the Convention would be state law. *See Insurance Co. of N. Am. v. Federal Express Corp.,* 189 F.3d 914, 920–22 (9th Cir.1999); *Pescatore v. Pan Am.*

---

**20.** A footnote in *Floyd,* foreshadowed this rule, by stating that whether "the distress experienced by relatives of injured or dead airline passengers qualified under Article 17 ... as '*damage sustained* ...' is a different question from whether psychic injury actually suffered by a passenger is encompassed." *Floyd,* 499 U.S. at 540 n. 7, 111 S.Ct. at 1496.

*World Airways, Inc.,* 97 F.3d 1, 8–15 (2d Cir.1996).

The Court, therefore, turns to Texas law to ascertain what damages are available to the Plaintiff.[21] This discussion assumes, of course, that Plaintiff can establish the "gateway" elements of an accident causing her husband's bodily injury and/or death. To clarify, the Court carefully notes that Mrs. McCaskey's injuries of whatever ilk are compensable only to the extent she can prove that an accident caused a death, a wounding or a bodily injury. However, Mr. McCaskey's injuries can satisfy this requirement. In other words, the chain of causation must begin with an accident, proceed to Mr. McCaskey's injury, which then and only then may have caused Mrs. McCaskey's own psychic or psychosomatic injuries.

■ Texas law allows a bystander claim for mental anguish. *See Reagan v. Vaughn,* 804 S.W.2d 463, 467 (Tex.1990). In order to bring such a claim, Plaintiff must prove that she (1) was located near the scene of the accident, (2) suffered shock as a result of a direct emotional impact from the contemporaneous observation of the accident, and (3) was closely related to the victim. *See id.* Indisputably, Mrs. McCaskey, who sitting next to the man to whom she was joined by the sacred bond of marriage, would experience the ultimate empathy and meet this test.

■ Texas law also clearly allows a plaintiff to recover for mental anguish suffered on account of the wrongful death of a family member. *See Moore v. Lillebo,* 722 S.W.2d 683, 685 (Tex.1986); *accord Moor-*

*head v. Mitsubishi Aircraft Int'l, Inc.,* 828 F.2d at 278, 288 (5th Cir.1987). Accordingly, Plaintiff may also recover mental anguish damages if she can establish that an accident caused her husband's death.

Defendants' Motion for Summary Judgment on Plaintiff's ability to recover mental anguish damages is **DENIED.**

### C. *Defendant Bethune's Personal Liability*

Plaintiff has also advanced claims against Defendant Bethune, who is· the Chief Executive Officer of Defendant Continental Airlines, Inc., in his individual capacity. Indisputably, Bethune boarded Continental Flight 1476 as a passenger.[22] Accordingly, Bethune has moved for summary judgment, contending that he owed Plaintiff no duty, or alternatively, breached no duty.

■ Under Texas law a corporate officer can be personally liable for his own negligence. *See Leitch v. Hornsby,* 935 S.W.2d 114, 117 (Tex.1996); *Keyser v. Miller,* 47 S.W.3d 728 (Tex.App.—Houston [1st Dist.] 2001, n.p.h.). "However, individual liability arises only when the officer . . . owes an independent duty of reasonable care." *Leitch,* 935 S.W.2d at 117. Thus, "[a] corporation's employee is personally liable for tortious acts which he directs or participates in during his employment." *Leyendecker & Assocs. v. Wechter,* 683 S.W.2d 369, 375 (Tex.1984).

■ Plaintiff introduces several pieces of evidence in her efforts to establish that Bethune breached an independent duty of

---

**21.** The parties have not briefed the choice of law issue, but all have relied upon Texas law to discuss other issues, such as Defendant Bethune's liability. Accordingly, the Court assumes, for purposes of this discussion, that Texas law applies to the damages portion of this dispute.

**22.** Bethune was traveling to New York City for a promotion of his book scheduled for the next day.

care. Plaintiff provides evidence that a flight attendant told Bethune that a passenger was ill with a possible stroke. At some point thereafter, Bethune had a brief discussion with the same flight attendant regarding Mr. McCaskey's condition. Later, Bethune entered the cockpit of the aircraft.[23]

From this evidence, Plaintiff attempts to cobble together a case against Bethune by arguing that Bethune was in the "communications loop," and thus participated in the commission of a tort. Plaintiff contends that Bethune needed to be in New York that evening and thus would have encouraged the crew to proceed to Newark despite the manifest need to divert. Alternatively, Plaintiff argues that Bethune's "participation" in the post-stroke events was a disruptive force, also distracting the crew from the need to divert. The evidence outlined above, however, does not even begin to support these conclusions.

Most problematically, these allegations pile inference on top of inference in the face of the uncontroverted testimony of all the crew members that Bethune knew little about the situation, and played no role in any decision making aboard the aircraft. Indeed, the allegedly most nefarious action of all, Bethune's entering of the cockpit, occurred, by all accounts, after the crew had completed its discussion with MedAire and had determined to proceed to Newark. There is simply no credible evidence tending to show that Bethune had any role in what the crew did on the date of Mr. McCaskey's stroke.[24]

For these reasons, Defendant Bethune's Motion for Summary Judgment is **GRANTED.** Plaintiff's claims against Defendant Gordon Bethune are hereby **DISMISSED WITH PREJUDICE.**

### D. *Defendant MedAire's Liability*

Defendant MedAire contends that it falls within the scope of the Warsaw Convention and that Plaintiff failed to file suit against it within the two-year statute of limitations set forth in the Convention. Accordingly, MedAire reasons that Plaintiff's claims advanced against it should be dismissed. The Court agrees.

#### 1. *Coverage of the Convention*

The Warsaw Convention provides the exclusive means by which a plaintiff may sue a "carrier" for injuries suffered during international transportation. The Convention, however, does not define what people or entities the term carrier encompasses. This initially left open the question of whether employees and/or contractors pro-

---

**23.** Bethune testified that he visits the cockpit on most flights. Perhaps notably, this was a full aircraft and Bethune had given up his seat in first class so that a complaining passenger seated near the McCaskeys could "get some rest." Bethune apparently stood in the area just inside the plane's front exit door for some period before entering the cockpit.

**24.** Plaintiff also seemingly attempts to craft a nonfeasance argument of sorts against Bethune. Plaintiff argues that Bethune was aware that his presence aboard the aircraft could create a heightened desire to arrive at the destination on time. Plaintiff thus argues that Bethune had a duty to ensure that the crew did not adjust their priorities so as to

place timeliness over safety. Plaintiff, however, cites no authority supporting this position, and the Court is unpersuaded. Furthermore, the facts do not support Plaintiff's argument. All the crew testified that they were not pressured by Bethune's presence aboard the aircraft. Both the Captain and First Officer had flown Bethune previously. Further, to the extent Bethune had some duty to assuage any ambivalence about where the crew's priorities should lie, the uncontroverted testimony indicates that he did so. Flight Attendant Robert Dean testified in his deposition that Bethune stated, "I know you can handle— you've got everything under control. I'm going to stand back and let you do your job."

viding service for a "carrier" fell within the Convention's scope.

In *Reed v. Wiser*, 555 F.2d 1079 (2d Cir.1977), the Second Circuit first addressed this issue. The *Reed* court held that the term carrier includes an airline's employees. *See id.* at 1092. The court expressed particular concern with the possibility that while an injured plaintiff could sue an airline only subject to the limitations of the Warsaw Convention, the same plaintiff could circumvent the Convention by suing airline employees directly. *See id.* at 1089. If such a result were countenanced, the necessary result would be that all airline employees would demand indemnity protection. *See id.* at 1090. This would then subject airlines to precisely the sort of unpredictable, unlimited liability that the Convention sought to curtail. *See id.* at 1089.

█ Following this decision, courts have generally accepted the principle that airline employees fall within the scope of the Convention. *See Croucher v. Worldwide Flight Servs., Inc.*, 111 F.Supp.2d 501, 504–05 (D.N.J.2000); *Alleyn v. Port Auth. of New York*, 58 F.Supp.2d 15, 23 (E.D.N.Y.1999); *In re Air Disaster at Lockerbie, Scotland*, 776 F.Supp. at 712–14. Moreover, virtually all courts have recognized that, in at least some instances, independent contractors are covered by the Convention. *See Alleyn*, 58 F.Supp.2d at 23. Courts, however, have applied two

different standards for determining whether a contractor's services fall within the Convention. *See id.* Some courts have held, or suggested, that a contractor providing services the airline would otherwise be required by law to provide falls within the Convention. *See id.* (explaining, for example, that those conducting security inspections required by law are covered); *see also In re Air Disaster at Lockerbie, Scotland*, 776 F.Supp. at 714 (adopting this rule without explanation); *Kabbani v. International Total Servs.*, 805 F.Supp. 1033, 1038–40 (D.D.C.1992). Most Courts, however, have determined, more broadly, that a contractor is also covered by the Convention if its services are provided in furtherance of the contract of carriage. *See Croucher*, 111 F.Supp.2d at 505; *Alleyn*, 58 F.Supp.2d at 23; *Waxman v. C.I.S. Mexicana de Aviacion, S.A. de C.V.*, 13 F.Supp.2d 508, 513–15 (S.D.N.Y.1998).

█ MedAire does not contend in its Motion for Summary Judgment that it was furnishing a service Continental was required by law to provide.[25] Thus, the Court must determine whether to follow those cases which have held that services provided in furtherance of the contract of carriage are covered. For several reasons, the Court concludes that it will follow those decisions which have applied the furtherance of carriage test.[26]

First, the bulk of the cases to have considered which standard should apply

---

**25.** MedAire's Reply Brief does attempt to raise this argument, but the Court does not address it.

**26.** In response to MedAire's argument, Plaintiff first contends, erroneously, that an independent contractor cannot be protected by the Convention. Next Plaintiff argues, without citing any authority, that because a physician-patient relationship existed between Mr. McCaskey and MedAire, the Convention does not cover MedAire. The services of a physician are said to have neither been performed

in furtherance of the contract of carriage nor have been required by law. This distinction makes no sense, however, because if Continental chose to employ doctors to travel on every flight, they would certainly fall within the Convention. Plaintiff then goes to some lengths to "distinguish" the cases on which MedAire relies, but still cites no authority of its own for the proposition that MedAire's services were not provided in furtherance of the contract of carriage.

have adopted the "in furtherance" test. *See Alleyn,* 58 F.Supp.2d at 23; *Croucher,* 111 F.Supp.2d at 505; *Waxman,* 13 F.Supp.2d at 513–15. Moreover, of those cases which have applied the more narrow "required by law" approach, it does not appear that any court has held that this rule is exclusive. Rather, those courts appear to have been confronted with situations, typically the provision of legally mandated security services, in which they did not need to reach whether a more expansive definition would be appropriate. *See Kabbani,* 805 F.Supp. at 1038–40. Thus, courts have held that a contractor is covered if either test is satisfied. *See Alleyn,* 58 F.Supp.2d at 23.

 A service is performed in furtherance of the contract of carriage if it is flight related. *See id.* at 24; *Waxman,* 13 F.Supp.2d at 515. The Court holds that MedAire's services, which included providing medical advice, aiding the crew in deciding whether to divert, suggesting appropriate airports for a diversion when needed, and arranging necessary medical care at the arrival gate, are given in furtherance of the contract of carriage.

Additionally, Continental and MedAire were parties to cross indemnity agreements. Thus, Continental could be required to indemnify MedAire if MedAire were found liable to the Plaintiff outside the Convention. This invokes the principle concern voiced by the *Reed* court that an airline not be faced with unlimited liability because of a plaintiff's suit against an employee. *See* 555 F.2d at 1089.

Finally, the Court is of the opinion that to exempt companies providing a service like MedAire from the Convention's reach would discourage the airlines from engaging such medical services. It would not be consistent with public policy to return to a situation wherein airlines must rely upon the fortuity of having experienced medical personnel aboard a given aircraft to diagnose and aid an ill passenger.

### 2. *Two Year Limitations Period*

As explained, the Convention applies to MedAire. Accordingly, the Convention's various limitations apply as well. Article 29 of the Convention provides that:

(1) The right to damages shall be extinguished if an action is not brought within 2 years, reckoned from the date of arrival at the destination, or from the date on which the aircraft ought to have arrived, or from the date on which the transportation stopped. (2) The method of calculating the period of limitation shall be determined by the law of the court to which the case is submitted.

Indisputably, in this case, Plaintiff did not sue MedAire within two years. Plaintiff, however, argues that state tolling provisions, in particular fraudulent concealment, should be applied to toll the limitations period. *See Flanagan v. McDonnell Douglas Corp.,* 428 F.Supp. 770, 776 (C.D.Cal.1977) (allowing tolling).

 In response, Defendant MedAire indicates that the great weight of cases, including the only two circuit courts faced with the issue, have held that state tolling rules do not apply. *See Husmann v. Trans World Airlines, Inc.,* 169 F.3d 1151, 1154 (8th Cir.1999) (rejecting tolling while the defendant airline was in bankruptcy); *Fishman,* 132 F.3d at 144–45 (declining to toll because of a plaintiff's infancy); *see also Castro v. Hinson,* 959 F.Supp. 160, 163 (S.D.N.Y.1997); *Magnus Elecs., Inc. v. Royal Bank of Canada,* 611 F.Supp. 436, 444 (N.D.Ill.1985).

As discussed by the Second Circuit in *Fishman,* the Convention drafters specifically considered and rejected a proposal that would have allowed for the tolling

rules of each forum to be applied.[27] *See Fishman*, 132 F.3d at 144. Therefore, the only matter referred to the forum court for consideration under Article 29(2) is whether a plaintiff has taken the necessary steps to invoke the forum court's jurisdiction within two-years. *See id.* In other words, this Court must apply local law "simply to determine when an action has been 'brought.'" *Castro*, 959 F.Supp. at 163.

As stated above, Plaintiff's claims against Defendant MedAire were not brought within two years. Accordingly, Defendant MedAire's Motion for Summary Judgment is **GRANTED.** Plaintiff's claims against Defendant MedAire are hereby **DISMISSED WITH PREJUDICE.**

**E.** *Texas Deceptive Trade Practices Act Claims*

Plaintiff's daughter and Plaintiff both contacted Continental after her husband's death seeking a refund of unused plane fares and other miscellaneous compensation. In response to these entreaties, Continental apparently sent out a boilerplate release document under which Mrs. McCaskey could have agreed to release her claims against Continental in exchange for $ 458.26. Plaintiff now complains that sending this release to her constitutes a violation of the Texas Deceptive Trade Practices Act ("DTPA"), Tex. Bus. & Comm.Code Ann. § 17.50.

The DTPA permits civil liability for "representing that an agreement confers or involves rights, remedies, or obligations . . . which are prohibited by law." *See id.* at § 17.46(b)(12). The Warsaw Convention, in Article 23, states that "[a]ny provision tending to relieve the carrier of liability or to fix a lower limit than that which is laid

down in this Convention shall be null and void." Plaintiff thus reasons that by sending her a release which would fix carrier liability below the Convention's limited liability provisions, Continental violated the Convention. This argument is incorrect.

■ The Supreme Court has identified one of the Convention's purposes as balancing the interests of passengers seeking recovery for injuries against air carriers seeking to limit liability under multifarious forum laws. *Tseng*, 525 U.S. at 170, 119 S.Ct. at 672. Thus, the Convention sought to compromise between the growing trend of air carriers to relieve or reduce liability in advance, versus the interest of customers in preserving personal injury recovery rights. *See id.* at 170–71, 119 S.Ct. at 672. Keeping this in mind, Article 23 of the Convention is obviously not intended to restrict the ability to carriers to settle claims or obtain releases after the occurrence of an accident. Rather, it makes clear that air carriers for the signatory nations cannot contract around the Convention, for example by establishing tariff terms that limit liability under Article 17 or damages recoverable under Article 22 in derogation of the Convention's rules. *See Butler's Shoe Corp. v. Pan Am. World Airways, Inc.*, 514 F.2d 1283, 1285 (5th Cir.1975). To hold otherwise, would, as argued by Defendant Continental, prohibit a plaintiff and a carrier from ever finally settling a claim for an amount less than $75,000.

■ Moreover, contrary to Plaintiff's position, the convention does not establish strict $75,000 liability for every injury suffered aboard an aircraft. A plaintiff must first establish, the "gateway" elements of recovery including an accident and physi-

---

**27.** By contrast, *Flanagan,* Plaintiff's principal case, "has been criticized for ignoring the draft minutes of the Convention." *Motorola,* *Inc. v. MSAS Cargo Int'l, Inc.,* 42 F.Supp.2d 952, 956 n. 3 (N.D.Cal.1998).

cal injury. If a plaintiff cannot, for example, establish that an accident occurred, then the airline has no liability. Further, the $75,000 liability cap negotiated in the Montreal Agreement operates as a maximum, not a minimum. *See In re Air Crash Disaster Near Warsaw, Poland,* 979 F.Supp. at 167. Accordingly, it stands to reason that in many cases passengers with minor injuries will seek to settle quickly with airlines for less than the limited liability cap. Indeed, that was the entire purpose of the Montreal Agreement, which significantly raised the damages cap, but eliminated the due care defense. *See id.* Thus, Continental's request that Plaintiff sign a release in order to consummate an offered settlement does not violate the Convention.

Furthermore, although not argued by either party, the DTPA requires that a plaintiff have "relied on" the false representation "to the consumer's detriment." Tex. Bus. & Comm.Code Ann. § 17.50(a)(1). In this case, Mrs. McCaskey did not sign the agreement, but Continental ultimately did pay her the $458.26. It is impossible to see how Mrs. McCaskey could have detrimentally relied upon an agreement that she rejected, apparently on the advice of counsel.

Defendants' Motion for Summary Judgment regarding the vitality of Plaintiff's DTPA claims is **GRANTED**. Plaintiff's claims under the Texas Deceptive Trade Practices Act are hereby **DISMISSED WITH PREJUDICE**.

### III. CONCLUSION

For the reasons set forth in more detail above the Court hereby **ORDERS** that Defendant Gordon Bethune's Motion for Summary Judgment is **GRANTED**. Defendant MedAire's Motion for Summary Judgment is also **GRANTED**. Defendants MedAire and Bethune are hereby **DIS-MISSED WITH PREJUDICE**. The Court further ORDERS that Plaintiff's causes of action under the Texas Deceptive Trade Practices Act are **DISMISSED WITH PREJUDICE**. The Motions for Summary Judgment with respect to all other parties and claims are **DENIED**.

**IT IS SO ORDERED.**